STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

16-578

STATE OF LOUISIANA

VERSUS

MARLON FRANK THOMAS

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 32246-12
HONORABLE GUY E. BRADBERRY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

PHYLLIS M. KEATY
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy, and Phyllis M. Keaty, Judges.

AFFIRMED.

John F. DeRosier
District Attorney
Karen C. McLellan
Assistant District Attorney
901 Lakeshore Drive, Suite 800
Lake Charles, Louisiana 70601
(337) 437-3400
Counsel for Appellee:
    State of Louisiana

**Chad Ikerd**
**Louisiana Appellate Project**
**Post Office Box 2125**
**Lafayette, Louisiana  70502**
**(225) 806-2930**
**Counsel for Defendant/Appellant:**
    **Marlon Frank Thomas**

**KEATY, Judge.**

Following a jury trial, Defendant, Marlon Frank Thomas, was found guilty of aggravated battery, aggravated burglary, attempted armed robbery, and attempted armed robbery with a firearm. The trial court sentenced Defendant to a total of forty years at hard labor. He now appeals his convictions. For the following reasons, we affirm.

## FACTS

On October 18, 2011, two masked men entered the Lake Charles, Louisiana, apartment of the victim, Bradford Jacobs, demanding money. A fight ensued, and the victim was shot in the back. The victim survived but was unable to identify the perpetrators.[1] DNA evidence retrieved from a glove found at the scene linked Defendant to the crime.

## PROCEDURAL HISTORY

Defendant was charged by grand jury indictment with one count of attempted second degree murder, a violation of La.R.S. 14:27 and 14:30.1, and one count of home invasion, a violation of La.R.S. 14:62.8. Defendant pled not guilty to the charges. Over defense counsel's objection, the indictment was later amended to change count two to aggravated burglary, a violation of La.R.S. 14:60, and to add two additional charges: count three—attempted armed robbery, a violation of La.R.S. 14:27 and 14:64, and count four—attempted armed robbery

---

[1] In *State v. Daugherty*, 15-400 (La.App. 3 Cir. 10/7/15), 175 So.3d 1164, this court affirmed the convictions and sentences of Defendant's accomplice, Dionte Daugherty. A unanimous jury found Mr. Daugherty guilty of attempted second degree murder and home invasion, for which he was later sentenced to forty years and ten years, at hard labor, respectively.

with a firearm, a violation of La.R.S. 14:27 and 14:64.3.[2] Defendant pled not guilty to the amended charges. The indictment was amended a second time to correct the name of the victim in count one and to add more specific information to counts two, three, and four.

Defendant's jury trial began on July 13, 2015. The jury retired for deliberations on July 16, 2015. After sending several notes to the trial court indicating that they were deadlocked, the jury returned the following verdicts late that evening: count one—guilty of aggravated battery (10-2); count two—guilty of aggravated burglary (11-1); count three—guilty of attempted armed robbery (11-1); and count four—guilty of attempted armed robbery with a firearm (11-1). Thereafter, the trial court ordered a pre-sentence investigation (PSI) and set the matter for sentencing. Defendant filed a Motion for New Trial, which the trial court denied after a hearing. On October 13, 2015, the trial court imposed the following sentences: count one (aggravated battery)—five years at hard labor; count two (aggravated burglary)—fifteen years at hard labor; count three (attempted armed robbery)—thirty-five years at hard labor; and count four (attempted armed robbery with a firearm)—five years at hard labor. The trial court ordered counts one, two, and three to run concurrently with each other and ordered counts three and four to run consecutively with each other. Defendant filed a written motion to reconsider sentence, which the trial court denied without a hearing.

Defendant now appeals, alleging the following assignments of error:

---

[2] This court denied Defendant's writ seeking review of the trial court's decision to allow the State to amend the bill of indictment in *State v. Thomas*, 15-70 (La.App. 3 Cir. 2/27/15) (unpublished opinion).

I. Evidence was insufficient to prove beyond a reasonable doubt that Marlon Thomas was one of the masked men who robbed the victim in this case.

II. The Trial Court abused its discretion and committed reversible error by not protecting Marlon Thomas' Sixth Amendment Rights by securing any waiver from Mr. Thomas of an actual conflict of interest his attorneys and their law firm had between their simultaneous representation of him and one of the State's key, adverse eye-witnesses, over a defense objection.

III. Trial Court erred by allowing the State to ask questions of Dr. Shimer about medical reports and medical issues outside the scope of general surgery, the only field in which he had been accepted as an expert, when the State deliberately prevented giving the defense notice of such testimony.

IV. Trial Court erred in not granting Marlon Thomas' Motion for a New Trial because the State's comments in closing that gave the jury the impression that Mr. Thomas had to be forced to provide his DNA by court order was factually wrong and impermissibly shifted the burden of proof onto the defense; thus, an admonition by the court was insufficient to protect Mr. Thomas' rights.

## DISCUSSION

### Errors Patent

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. Our review has revealed one error patent. Defendant was incorrectly advised at sentencing that he had two years from that date to file an application for post-conviction relief. Louisiana Code of Criminal Procedure Article 930.8 provides that a defendant has two years after the conviction and sentence become final to seek post-conviction relief. The trial court is directed to inform Defendant of the correct provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of the opinion and to file written proof in the record that Defendant

3

received the notice. *See State v. Baylor*, 08-141 (La.App. 3 Cir. 11/26/08), 998 So.2d 800, *writ denied*, 09-275 (La. 11/20/09), 25 So.3d 795.

## Assignment of Error Number One

Defendant asserts the evidence was insufficient to prove he was one of the men who robbed the victim. He points out that no witness identified him as one of the perpetrators, that he did not confess to the crime, and that his conviction was based on circumstantial evidence.

The analysis for sufficiency of the evidence claims is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

When the sole issue is Defendant's identity as the perpetrator, the supreme court has explained:

> [W]hen the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. Positive identification by only one witness is sufficient to support a conviction. It is the factfinder who weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations.

4

*State v. Hughes*, 05-992, pp. 5-6 (La. 11/29/06), 943 So.2d 1047, 1051 (citations omitted).

## *Evidence at Trial*

The first witness to testify for the State was Robert Broussard, Supervisor of Information for Calcasieu Parish 911. Mr. Broussard identified State's Exhibit 1 as a compact disc he prepared at the request of the District Attorney's Office which contained audio recordings of two 911 calls concerning an October 18, 2011 incident. The recordings were played for the jury. A caller who identified himself as "Gregory" stated that he needed police at 410 6th Street. Gregory explained that he was eating with friends when two men dressed in black and wearing masks entered the apartment with guns and began fighting with someone in the home. He stated that he was able to get out of the apartment and that as he watched the two intruders later walk away from the apartment, one of them appeared to have been shot in the foot.

The next witness called by the State was Sergeant Franklin Fondel, a seventeen-year veteran of the Lake Charles Police Department, who testified extensively about his investigation in this case. He stated that he responded to the scene after learning about an incident while monitoring his police radio. Upon his arrival, he encountered Cristin Kibodeaux [3] standing in the driveway crying. Ms. Kibodeaux told him that her friend had been shot. Sergeant Fondel approached the apartment and saw the victim lying near the doorway. An Acadian Ambulance had arrived and was preparing to transport the victim to a hospital.

---

[3] In the transcript of Sergeant Fondel's testimony, Ms. Kibodeaux's first name is spelled "Kristen." During her own testimony, she spelled her first name "Cristin."

Sergeant Fondel later met the victim's upstairs neighbor, Gregory Jones,[4] in the front yard and learned that Mr. Jones was in the victim's apartment at the time of the invasion. Thereafter, Sergeant Fondel had Mr. Jones and Ms. Kibodeaux brought to the police station to give video statements to Detective David Roup, who was working the case with him. Sergeant Fondel requested that headquarters send Jordan Ashworth, an ID Technician (ID Tech), to process the scene. He then joined Officer Dustin Fontenot near a red dumpster at the corner of Hodges and 6th Streets. According to Sergeant Fondel, Ms. Kibodeaux and another witness had told Officer Fontenot that they heard a loud boom when the two suspects ran from the apartment towards Hodges Street before getting into a white Lumina with dark tinted windows. Sergeant Fondel stated that when Officer Fontenot opened the dumpster, it was empty of trash but contained two gloves and a ski mask.

Sergeant Fondel explained the layout of the victim's apartment, describing it as shotgun style with a bedroom/living room, followed by a kitchen, and then a bathroom which led out the back door to a patio. Between the toilet area and the back door, Sergeant Fondel saw a white left-handed garden glove with black beads which he collected as evidence. When shown State's Exhibit 17, Sergeant Fondel described it as an envelope labeled "One gray and white glove" with a notation that the glove was "Collected from the bathroom floor and front of back door." Sergeant Fondel examined the glove and identified it as the glove seized from the victim's bathroom floor. Sergeant Fondel also recalled observing three 380 shell casings in the kitchen and two more in the bathroom, all of which were photographed and logged into evidence at the police station by the ID Tech.

---

[4] Apparently, Mr. Jones was the "Gregory" who made the 911 call. He did not testify at trial.

Sergeant Fondel further testified that witnesses told him that two males had entered the apartment dressed in black, wearing ski masks, and carrying weapons. One subject was described as being short, approximately 5'5", and the other suspect was described as being tall, approximately 6'1". Through his investigation, Sergeant Fondel learned that Defendant is 6'0". When asked his next step in the investigation, Sergeant Fondel stated he contacted the hospitals to see if anyone had sought treatment for a gunshot wound since a witness reported seeing one of the suspects hobbling away from the scene as if he had been shot. Sergeant Fondel did not learn of anyone other than the victim receiving treatment for a gunshot wound around the time of the incident.

Sergeant Fondel testified that after the scene was processed, he and the ID Tech went to check on the victim at St. Patrick's Hospital Emergency Room. The victim, who was in extreme pain, was being treated for a gunshot wound to his upper right back and for two cuts to the top of his head that had been inflicted by the suspects; the ID Tech photographed the victim's injuries. The victim was unable to provide Sergeant Fondel with any information regarding who was responsible for shooting him. Thereafter, the victim underwent emergency surgery to treat his gunshot wound. The photographs taken by the ID Tech were shown to the jury during Sergeant Fondel's testimony.

Sergeant Fondel testified that two days after the October 18, 2011 incident, he received an anonymous phone call regarding the identity and location of a subject that was possibly involved in the incident. The tipster said the subject had suffered a gunshot wound and was trying to get out of town to seek medical attention. When Sergeant Fondel and several officers from the S.W.A.T. team arrived at the address given to them by the anonymous caller, they were advised by

7

the resident who answered the door that her friend "Marlon Thomas," i.e., Defendant, was there, and they were given permission to enter the house. Sergeant Fondel found Defendant in a back bedroom with blood-soaked gauze wrapped around his left knee. Defendant was placed under arrest and agreed to get medical attention. During his testimony, Sergeant Fondel identified a photo depicting a circle around the area of Defendant's left calf where a bullet was lodged. Sergeant Fondel stated that after the bullet was removed from Defendant's leg, it was immediately put into a jar and given to the ID Tech. Sergeant Fondel testified that the bullet removed from Defendant and the five casings found at the victim's apartment were brought to the Louisiana State Police Crime Laboratory (La. Crime Lab) in Baton Rouge, Louisiana, by an ID Tech. Defendant was brought to the detective division after he left the hospital. Defendant gave a statement wherein he claimed he was shot on October 18, 2011, around 6:15 p.m., in the Fisherville area.[5] Defendant admitted that he failed to report the gunshot to police and to get medical attention. In his statement, Defendant stated he was in an alley area when someone drove by and shot him. When asked if anyone reported shots fired in the Fisherville area at that time, Sergeant Fondel responded:

> None. I checked with our headquarters. Most of the time when you have shots fired anywhere in the city, sometime if someone else would hear shots or something, they would call just to say shots were fired in the area. We had no shots fired in that area on that date at 6:15, or any that evening time. The only shots fired call we had of a shooting [] was on 410 6th Street, where we was [sic] dispatched to.

When the State questioned Sergeant Fondel about the dumpster, he replied:

> I advised earlier that Officer Dustin Fontenot, after obtaining that information from the witness, Ms. Kristen Kibodeaux, he went to that area to check it. And he observed the ski masks and observed two

---

[5] Sergeant Fondel testified that the Fisherville area of Lake Charles "consisted of Evans Street area, Goos Boulevard off of Shattuck Street, McMillan Park area."

gloves, which the gloves was [sic] black and white. The black beads, white, with all black ski mask that was in the dumpster, the red dumpster.

Sergeant Fondel described a close-up picture of the ski mask and two gloves found in the dumpster. When asked if he was able to make any connection between the items found in the dumpster and Defendant's accomplice, Dione Daugherty, Sergeant Fondel explained:

> Yes. After those items were submitted to our Southwest Crime Lab here in Lake Charles, Louisiana. And - - and in December, a hit came back off of those gloves and the ski mask, which came back from a CODIS hit to Dionte Dougherty [sic], at which time we was - - had to obtain DNA from Dionte Dougherty [sic] so it can be compared to the CODIS hit that the crime lab had discovered. And once they discovered that and we got the DNA, we submitted back to the crime lab, and they compared it, and it came back positive to Dionte Dougherty [sic].

On cross-examination, Sergeant Fondel stated he was told that Joshua Plummer[6] was at the victim's residence prior to the incident. When asked if Mr. Plummer's name came up during Defendant's interview, Sergeant Fondel stated that "it probably did." Mr. Plummer's name also came up in his interview with the victim, Bradford Jacobs. According to Sergeant Fondel, the victim stated that Mr. Plummer had been at his residence between 2:00 and 8:00 p.m. on the day of the incident and that Mr. Plummer knew the victim had a large amount of cash. Sergeant Fondel learned that Mr. Plummer left quite suddenly just before the incident. Sergeant Fondel did not interview Mr. Plummer at that time.[7]

Sergeant Fondel noted that the name Anthony Batiste came up in his investigation, but not as having involvement in the incident in question. As a

---

[6] Joshua's last name is spelled "Plummer" in some portions of the transcript and "Plumber" in others. He did not testify at trial. For consistency, we use "Plummer" throughout.

[7] As will be discussed later in this opinion, Sergeant Fondel later questioned Mr. Plummer about this incident when he investigated and arrested him on another matter in August of 2012.

result, he did not interview Mr. Batiste. Sergeant Fondel stated that when he investigated the shooting death of Mr. Batiste that occurred after this incident, he noted in his report that Mr. Batiste's nickname was "Toodie." The following colloquy took place regarding names mentioned by the current victim in his interview:

Q. Okay. Now, returning back to your interview with Mr. Bradford Jacob[s]. In that interview did he indicate that one of the gunmen was referring to the other as "Toodie" or "Tootie"?

A. He mentioned a "Toodie."

Q. Uh-huh. He also did mention the name Anthony Batiste?

A. I don't recall right off if he did or not, sir.

On re-direct, the State asked Sergeant Fondel how he put aside other suspects and focused on Defendant. Sergeant Fondel answered:

Due to evidence that was submitted to the lab regarding [] witnesses, the two witnesses that was [sic] in the residence at the time of this incident. That evidence was sent to the lab, and once DNA was obtained Mr. Batiste along with Joshua Plumber was [sic] excluded from this investigation.

Sergeant Fondel concluded by stating that no evidence was recovered in his investigation of this matter that pointed to either Mr. Plummer or Mr. Batiste.

Jordan Ashworth, a crime scene technician for the Lake Charles Police Department, testified that Sergeant Fondel requested her presence at the scene of the incident. She collected five 380 shell casings at the scene and later a projectile that was removed from Defendant at the hospital. Ms. Ashworth identified Defendant as the person from whom the projectile was removed and State's Exhibit 42 as the projectile taken from Defendant's leg.

Tammy Vincent, a registered nurse at Lake Charles Memorial Hospital briefly testified at trial to identify a vial of blood collected from Defendant on

June 26, 2012, for purposes of DNA analysis. Monica Quaal, the DNA technical leader of the Southwest Louisiana Crime Laboratory in Lake Charles, Louisiana, was accepted as an expert in DNA analysis. Ms. Quaal stated that she received a black ski mask, a set of gloves, and a separate glove. On the black ski mask and set of gloves, Ms. Quaal found nothing relating to Defendant. On the separate glove found on the victim's bathroom floor, however, Ms. Quaal found a mixture of DNA from at least two people. She explained that she found skin cells, or contact DNA, left from contact with that glove. When Ms. Quaal compared the contact DNA found in the glove with a reference sample from Defendant, she could not exclude Defendant from being a contributor. Ms. Quaal testified that she could exclude 99.9999992 percent of the Caucasian population, 99.999996 percent of the African American population, and 99.999997 percent of the Hispanic population. She was able to affirmatively exclude the victim as a contributor to the DNA found inside the separate glove.

On cross-examination, Ms. Quaal testified that she had reference samples from Defendant, the victim, and Mr. Daugherty but not from Mr. Batiste or Mr. Plummer. She agreed that she did not know who the other DNA belonged to and could not exclude either Mr. Batiste or Mr. Plummer because she did not have reference samples from them. On re-direct, Ms. Quaal explained that the inside of a glove is a good place to find DNA since a person's skin cells will be scratched off during movement.

Charles Watson, Jr., a forensic scientist with the La. Crime Lab was accepted as an expert in firearms examination. Mr. Watson was provided with five 380 caliber cartridge cases and one bullet in connection with this matter. He stated that the five cartridges did not have enough detail to determine whether they were

fired from the same firearm. While the bullet provided to him was a "380 auto caliber," Mr. Watson was unable to say that the bullet came from one of the casings found at the scene. On cross-examination, Mr. Watson stated that the five cartridges were made by three different manufacturers.

Dr. Richard Shimer, a staff surgeon at Lake Charles Memorial Hospital, testified as an expert in general surgery. Dr. Shimer treated the victim for the gunshot wound he received in this incident. Over defense counsel's objection, Dr. Shimer was allowed to review and testify regarding a report prepared by a Dr. Gray, the physician who removed that bullet from Defendant's leg. Dr. Shimer testified that the bullet entered Defendant's leg above his knee and did not exit. When asked about the trajectory of the bullet, Dr. Shimer stated that he could not say whether or not the bullet was shot from above. On cross-examination, Dr. Shimer agreed he was not an expert in ballistics.

Cristin Kibodeaux testified that the victim called her on October 18, 2011, asking her to pick up some cigarettes and alcoholic beverages for him because he had been drinking all day and did not want to drive. As she walked toward the victim's apartment around 9:00 p.m., she saw two men standing outside in the backyard. Both men were wearing dark clothing and jackets with hoods. She described one as short and one as tall, estimating that the tall man was 6'0" to 6'1" and the short man was 5'4" to 5'5". Ms. Kibodeaux stated that the two men were "black guys," the taller one being darker and the shorter one being lighter skinned. When Ms. Kibodeaux walked into the apartment, the victim and someone named Greg was there. At some point after she arrived, Ms. Kibodeaux turned around to see two men wearing masks and gloves standing in the kitchen next to the victim. The shorter man had a handgun pointed at the victim. When the taller man held up

12

a handgun, the victim turned, and the shorter man hit the victim in the head with his gun. Ms. Kibodeaux screamed, put her hands over her face, and started backing away from them. She stated she did not want to look at the two men because she did not want to see their faces. The men asked the victim, "Where's the money? Give us money," and the victim told them he did not have any money. The men shouted for someone to turn the television volume up loud and demanded that the victim take off his clothes. The victim refused and began fighting with the shorter man. Ms. Kibodeaux heard the shorter man tell the tall man, "Man, E.O, E.Z" or something along those lines. As she ran out of the apartment, she heard two gunshots. As she reached the second door to exit the building, she heard two or three more shots. Ms. Kibodeaux then ran toward a nearby house and banged on the door saying, "Please help me." When the couple inside cracked the door open, Ms. Kibodeaux told them, "Please call 911. There's two men with guns. I believe they shot my friend. Please help." Thereafter, the couple shut the door in her face so she hid on their porch. Soon the two assailants came walking toward her. She described the men's behavior as odd, stating:

> A.     Yeah, I mean, they were - - they were walking very calm, casual. They weren't fleeing the scene. They weren't running. They weren't looking around nervously. They were walking, afternoon stroll, and went up the street. As soon as I see them, you know, I remember being flabbergasted at first at how they were leaving the scene so nonchalantly, but I ducked back down after I saw them walking. I ducked down hoping they wouldn't see me.
>
> I hear a noise, and I remember taking mental note, I was saying to myself this is when you need to try to get mental notes of what they look like or what they're doing. So, as I heard a noise I was trying to get a mental note of what it was.
>
> . . . .
>
> Q.     What did the noise sound like?

A.    It sounded like a lid being slammed.  It sounded to me like a trash can lid or something like that being slammed, you know, because I have the big bin trash cans at my house and I'll open it, you know, and when I'm done, boom.

. . . .

A.    Because after I heard it and looked back up I noticed a dumpster, not a trash can sitting on the road.  I noticed a dumpster in a front yard, as if the house were being renovated, you know, and I said right then that's what that noise was, that dumpster.  So, as soon as I saw the police officers I said, "You need to check that dumpster.  I heard that dumpster.  I believe they put something in the dumpster. You need to check that dumpster."

Once Ms. Kibodeaux saw the intruders leave, she went back to the apartment and found the victim lying on the floor with a gunshot wound.  When she went to the kitchen to get a rag, Ms. Kibodeaux noticed her car keys were missing.[8]  A few minutes later, she heard sirens.  When the police officers arrived, she told them that the men had driven off toward 12th Street in what she believed was a "white Lumina."  On cross-examination, Ms. Kibodeaux stated that she did not know which one of the two men fired any of the gunshots.  She did not recall either of the two men limping as they were walking away after the incident, but she clarified that she could not see their feet.

Sergeant Fondel was recalled as a witness and was asked about several photographs marked as State's Exhibits, 47, 48, and 49 which were images of the victim's kitchen counter.  Sergeant Fondel identified items in the photographs, including a bag with a pack of cigarettes and a bottle of beer, a scale, and a plastic bag containing powder residue.  He then testified regarding State's Exhibit 50, a photograph of a loveseat in the victim's living room upon which there were several items that had been removed from the victim's pocket:  a large amount of U.S.

---

[8] Ms. Kibodeaux was not asked what kind of car she had driven to the victim's residence.

paper currency, a cell phone, and a brown medicine bottle containing what appeared to be rocks of cocaine. According to Sergeant Fondel, the victim admitted to owning the cocaine in the brown bottle. On cross-examination, defense counsel questioned Sergeant Fondel about Mr. Plummer. The defense then introduced a document which Sergeant Fondel identified as showing that Mr. Plummer had been sentenced to twenty years after being convicted of home invasion. On re-direct, Sergeant Fondel explained that he had arrested Mr. Plummer on August 24, 2012, on a matter unrelated to his investigation of Defendant or Mr. Daugherty regarding the shooting of Bradford Jacobs, the victim in this matter.

The victim was the next witness to testify. He stated that on the day of the incident, he had played video games with Mr. Plummer at his apartment from about noon until 8:00 p.m. He explained that he had known Mr. Plummer for approximately thirteen years. After Mr. Plummer left the victim's apartment, the victim's friend, Gregory Jones remained, and a short time later, Ms. Kibodeaux, arrived. The victim and Ms. Kibodeaux were talking at the counter when two guys wearing masks and gloves walked in with guns. The two men brought the victim to his bed and asked him where his money was. When asked if he recognized Mr. Plummer's voice, the victim replied:

> A.    Right and neither one of them could possibly be Josh because Short was two inches shorter than me and Josh is two inches taller than me and Tall is too tall to be Josh and he's also dark skinned.
>
> Q.    So I want to clarify for the Jury. When you talked about Short and you talked about Dark, you're talking about the two guys in the masks, right?
>
> A.    Right.
>
> Q.    Because you couldn't see their faces.

A.    No.  I couldn't see their faces.  On Short you could see underneath his neck right here and that's how I knew he was light-skinned and also he had his sleeves rolled up so I knew he was light-skinned; and Dark, I could tell under his eyes with his mask and by his mouth he was brown skinned like me.

Q.    So Short and Dark, they didn't even match the physical description of Josh?

A.    No, sir.

Q.    Did they sound like Josh?

A.    No, sir.

When asked if he knew what money the intruders were talking about, the victim stated he had no idea, but he guessed they may have been talking about the money Mr. Plummer knew the victim was going to use to buy rims for his truck. The victim stated that he had approximately $4,000.00 in his apartment which he had received from Entergy for a power outage that had damaged some of his appliances.  The victim admitted that he had been drinking and had smoked some marijuana on the day of the incident.

When asked to describe the incident, the victim stated:

A.    The guy sat me on the bed.  Once again he asked where the money was.  I told him I didn't have any money.  So he taps me on top of the head with the gun.  And I told him don't do that again. Don't hit me with the gun again.  So he went to do it - - well, before that he asked me to take off my clothes.  And I said no, I'm not taking off my clothes either.  So like I said, he went to hit me with the gun again and I just started fighting him, beating him.  I walked him all the way to the kitchen because my house went living room, kitchen and bathroom.  So I just punched him all the way to the tub.

Q.    So you started fighting back?

A.    Right.

      . . . .

Q.    What happens once you get to the bathroom?

16

A.  I leaves[sic] him in the tub and he's hollering.

Q.  What do you mean you leave him in the tub? You pushed him into the tub?

A.  I punched him in the tub; I pushed him in the tub, so he's hollering to the back door. I don't know what he was hollering, but I see somebody come into the back door. I went to hit him twice. I think I connected once and then I got shot. I heard pow pow and got shot. I hit the floor like all the life came out of me. While I was on the floor I hear cling, cling outside and I didn't know what that was. So two or three days later after waking up at the hospital I realized that one of the guys shot himself and I see the pictures that you had, so I put two and two together and he must have tripped over the - -

MR. FLAMMANG:

I'm going to have to object. This is speculation.

THE COURT:

It is.

Q.  Let me ask you this way, Brad: you said you heard clink, clink?

A.  Right.

Q.  This clink, clink sound, this was after the shots were fired?

A.  Yes. This is when I was on the ground.

Q.  So after you were on the ground you hear clink, clink. What did you think that clink, clink sound was at the time?

      . . . .

A.  I didn't have no idea at that time.

(Alteration in the original). The victim then explained that the back door leading from his bathroom connected to the back porch where a weight bench was located. When asked if he could give any specific information about what "Tall dark," did that night, the victim replied:

17

> I can't say anything really about Tall dark, but he was there because Short had me in the front with the gun saying everything, pointing the gun to my head, telling me [to] take all my clothes off and trying to get me to take all my clothes off. I really didn't see Tall until the end.

At that point, the victim heard "Short" holler something, and "Tall" came in. After the victim tried to hit "Tall," he heard two gunshots. The victim stated that in his statement to police, he mentioned the name "Anthony Batiste" because that was the name "surfacing around" on the street.

On cross-examination, the victim admitted he originally told police that he pulled the bottle of crack cocaine out of the pocket of Anthony Batiste during the struggle. He explained that originally he was afraid "they was [sic] going to try to make this out of a drug case," but he eventually recanted that statement. According to the victim, he used the scale found in his apartment to weigh cocaine for personal use and to make sure he was not shorted when he purchased marijuana. After his memory was refreshed with a prior statement he made to Sergeant Fondel, the victim remembered telling him that the gunmen were not wearing gloves. When asked if he told Sergeant Fondel that one of the gunmen was calling the other one "Tooty, Tuchi, [or] Tooty," the victim responded:

A. A friend of mine, Greg Jones that was there, that's what he said he was hollering out.

Q. But do you remember?

A. I don't recall saying that to Mr. Fondel, but I might have but that's what my friend, Greg, said they were saying.

On re-direct, the victim testified that his memory was good at the time he spoke with Sergeant Fondel on November 30, 2011, but that he was in a wheelchair due to injuries caused by the gunshot he received, and he was on

doctor-prescribed medication at the time. The State asked the victim the following:

> Q. Brad, if they weren't wearing gloves[,] do you remember seeing their hands?
>
> A. Yes, sir. I don't recall them having gloves on. I remember seeing Short's, like I said, his sleeve was pulled up. That's how I know he was bright, and you could see all under his neck area. That's how I knew it was bright. And then Tall was dark because you could see in his mask around his eyes that he was dark like me; and also I could see under his neck that he was dark like me.

The victim testified that he could see the gunmen's wrist area.

### *Defendant's Argument on Appeal*

Defendant argues that the State offered no direct evidence of his identity as one of the gunmen who entered the victim's apartment on the night in question. In his appellant brief,[9] Defendant asserts:

> There was no witness or victim who identified Marlon as being one of the perpetrators. There was no confession by Marlon admitting to his culpability in this crime. Instead, the State presented a circumstantial case about Marlon's height and build, partial DNA matches from a mixture of DNA found in a glove, and a gunshot wound that Marlon had to his leg and the relevance that had to this incident.

Defendant also argues that the witnesses' stories diverged regarding whether the gunmen wore gloves, whether one of the gunmen had a limp when walking away, and which of the gunmen shot the victim. Additionally, Defendant argues:

> [T]he State only offered inconclusive circumstantial, physical evidence. The caliber of bullets taken from Marlon's leg and found in Mr. Jacob[s'] apartment were .380, one of the most common bullet calibers used in America. Thus, the odds that any random two handguns would use that caliber bullet is relatively high. Therefore, any conclusions drawn from such a finding is speculative and insignificant. The State was not, however, able to match the bullets to a particular gun, a far more significant piece of evidence if it existed.

---

[9] When discussing the arguments made by the parties' in their appellate briefs, all references to page numbers from the record and from either parties' brief have been omitted.

19

As for the strength of the State's DNA evidence, Defendant argues:

> Finally, the State sought to inflate the significance of what it called a "match" of Marlon's DNA to a glove found not in Mr. Jacob[s'] apartment, but in the garbage near his home. The profile was described as a mixed profile, which means it had *at least* two contributors to the mixture. When this occurs it makes determining a "match" very difficult. As the State's expert testified, when you have a mixture profile, assuming the analyst did everything right and the machines worked properly, if the results of the test show "peaks 1, 2, 3" at a given loci, this means "you can not exclude anyone who has a 1, 2, or 3 peak at that area. You can exclude anybody who might have a 4, 5, 6, 7, or 8, but you can't exclude anyone who would have a 1, 2, or 3."

### *The State's Argument on Appeal*

In its appellee brief, the State argues that none of the testimony was inconsistent: rather, each witness had his own perspective. As for Defendant's claim that he was not shot during the robbery, the State refers to the 911 call, during which the caller, indicated that one of the perpetrators was "hobbling away." The State contends as follows:

> It is believed that in his attempt to get out of the apartment, the defendant tripped over the weight bench and shot himself in the leg. Brad testified that he was in the bathroom suffering from a gunshot wound when he heard a "clink clink" sound. The backdoor of Brad's bathroom is connected to his back porch where he had an old weight bench. When shown pictures of the back porch, Brad stated that the bench was normally not in the middle of the walkway.

The State further submits that even though Ms. Kibodeaux testified that she did not see either man limping away, she also testified that she did not see their feet well.

As for Defendant's argument regarding the DNA evidence, the State argues:

> Finally, the defendant avers that "the State sought to inflate the significance" of the DNA found in this matter. DNA analyst, Ms. Monica Quaal testified that Defendant's DNA could not be excluded from being a contributor to the mixture of DNA found in the glove. The defendant makes much fuss about her testimony and states that simply because someone is "not excluded" does not mean that they are "included" as the provider of the DNA. However, Ms. Quaal could only speak of exclusion because there was more than one

contributor to the DNA glove. She explained that 99.9999992 percent of the Caucasian population, 99.999996 percent of the African American population and 99.999997 [percent] of the Hispanic population could be excluded as a contributor to the DNA found in the glove, but the defendant could not be excluded. Those are pretty high odds against the defendant. The possibilities abound as to who else could have been a contributor or who else could have been excluded, but that would have no effect on the findings regarding this defendant's DNA in the glove.

## *Legal Analysis*

First of all, we note a misstatement made by Defendant in his brief. In his attempt to diminish the importance of the DNA evidence, Defendant asserts that the DNA "matched" to Defendant was recovered from one of the gloves found in the dumpster near the victim's home, not from the glove found in the victim's apartment. According to the evidence at trial, however, Defendant's DNA could not be excluded as a contributor to DNA retrieved from the glove found in the victim's bathroom. When shown State's Exhibit 17, Sergeant Fondel stated that it was an envelope labeled "One gray and white glove." There was an indication on the envelope that the glove was collected "from the bathroom floor and front of back door." The glove from which Ms. Quaal extracted DNA was the glove found on the victim's bathroom floor. When Ms. Quaal compared the contact DNA found in the glove with a reference sample from Defendant, she concluded that she could not exclude Defendant from being a contributor "to that mixture." Thus, Defendant was linked through DNA evidence to the glove found in the bathroom of the victim's apartment, not from the gloves found in the dumpster.

In *State v. Falgout*, 15-953 (La.App. 4 Cir. 8/24/16), 198 So.3d 1232, the defendant challenged his identity as the perpetrator of a sexual assault. Like the present case, the victim did not identify Falgout. Instead, Falgout was identified through DNA analysis of swabs taken from the victim's body. Falgout could not

be excluded as a minor contributor to DNA found on the victim's left buttock. The court noted that the DNA expert concluded it was "411 billion times more likely that the sample" taken from the victim's buttock was a mixture of DNA from the victim and Falgout than a mixture from the victim and an "unrelated random individual from the Caucasian population." *Id.* at 1242. "With respect to the African-American population, it was 195 trillion times more likely" that the DNA found on the victim's buttock was from the victim and Falgout than from the victim and another random individual; and "with respect to the Southwest Hispanic population, it was 54.0 trillion times more likely" that the DNA was from the victim and Falgout than the victim and an "unrelated random individual." *Id.* Falgout attempted to diminish the importance of the DNA evidence by theorizing that his DNA could have been transferred to the victim "when the perpetrator made her lie down on the wooden board while he attempted to rape her," that the "DNA sample was negative for seminal fluid," and that the victim "fail[ed] to remember if the perpetrator was circumcised." *Id.* After reciting the DNA expert's rebuttal to each of these theories, the fourth circuit stated:

> Nonetheless, none of these arguments disproves his identification as the perpetrator. The jurors were made aware of all of these arguments, and they still found that the State proved that the defendant was the perpetrator. A fact finder's credibility determination is entitled to great weight and should not be disturbed unless it is contrary to the evidence. The defendant has made no showing that the jury's finding is contrary to the evidence. Despite the lack of any identification by the victim, the State showed that it was between 411 billion to 195 trillion times more likely that the sample taken from K.W.'s buttock contained DNA from her and the defendant than from her and another unrelated random individual.
>
> While K.W. did not identify the defendant, the DNA evidence adduced at trial was sufficient for the jury to reject the defendant's theory that his DNA was transferred to her when she lay down on the wooden board. Thus, the State produced sufficient evidence for the jury to find beyond a reasonable doubt that the defendant was the

22

perpetrator of the sexual assault, supporting its verdicts of guilty of two counts of attempted forcible rape.

*Id.* at 1242-43 (citations omitted).

Similarly, the jury in the present case heard Defendant's hypothesis of innocence, i.e., that someone else committed the crime, that the DNA evidence was inconclusive, and that his gunshot wound occurred during a shooting at another location. The jury was also made aware that even though 99.9999992 percent of the Caucasian population, 99.999996 percent of the African American population, and 99.999997 percent of the Hispanic population could be excluded, Defendant could not be excluded as a contributor to DNA recovered from a glove found in the victim's bathroom on the night of the incident. Additionally, the jury heard the testimony of two people who saw the perpetrators leaving the scene. One witness's testimony was given in the form of a 911 call, wherein the witness stated that one of the perpetrators looked like he was shot in the foot. The other witness said the perpetrators were walking away nonchalantly but admitted that she did not see their feet clearly. Two days after the incident, police received an anonymous tip that a person had suffered a gunshot wound and was trying to get out of town to seek medical attention. Based on that tip, the police found Defendant with a gunshot wound to his leg. Defendant gave inconsistent explanations as to how his leg was injured, neither of which was corroborated by the evidence. Finally, the caliber of the bullet extracted from Defendant's leg was the same caliber of the shell casings found at the victim's apartment.

After hearing all of the above, the jury chose to reject Defendant's hypothesis of innocence. This court has stated the following regarding a jury's rejection of a defendant's hypothesis of innocence:

23

With respect to a jury's rejection of a hypothesis of innocence, our supreme court in [*State v.*] *Calloway*, [07-2306 (La. 1/21/09),] 1 So.3d [417,] 422 (citations omitted), concluded:

> [W]e have repeatedly cautioned that due process, rational fact finder test of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), does not permit a reviewing court to substitute its own appreciation of the evidence for that of the fact finder or to second guess the credibility determinations of the fact finder necessary to render an honest verdict. A reviewing court may intrude on the plenary discretion of the fact finder "only to the extent necessary to guarantee the fundamental protection of due process of law." Thus, as Judge Pettigrew emphasized, when a jury reasonably and rationally rejects the exculpatory hypothesis of innocence offered by a defendant's own testimony, an appellate court's task in reviewing the sufficiency of the evidence under the Due Process Clause is at an end unless an alternative hypothesis "is sufficiently reasonable that a rational juror could not 'have found proof of guilt beyond a reasonable doubt.'"

> The jury's decision to reject Defendant's hypothesis regarding the commission of the crime was based upon its rational credibility and evidentiary determinations. Accordingly, the jury's verdict should not be overturned.

*State v. Jackson*, 14-9, pp. 12-13 (La.App. 3 Cir. 6/18/14), 146 So.3d 631, 639, *writ denied*, 14-1544 (La. 2/27/15), 159 So.3d 1066.

In the instant matter, Defendant never offered an explanation as to how his DNA would be on a glove found in the victim's bathroom. On the other hand, "the State produced sufficient evidence for the jury to find beyond a reasonable doubt" that Defendant was one of the masked men who robbed the victim. *See Falgout*, 198 So.3d at 1243. The jury's decision to reject Defendant's hypothesis regarding his non-participation in the crime was based upon its rational credibility and evidentiary determinations. Accordingly, the jury's verdict is not contrary to the evidence and will not be overturned. Defendant's first assignment of error lacks merit.

## Assignment of Error Number Two

Defendant asserts the trial court abused its discretion and committed reversible error by not securing a waiver from Defendant of an actual conflict of interest his attorneys had between their simultaneous representation of him and, Ms. Kibodeaux, one of the State's key witnesses.

In *State v. Garcia*, 09-1578, pp. 37-38 (La. 11/16/12), 108 So.3d 1, 28, *cert. denied*, ___ U.S. ___, 133 S.Ct. 2863 (2013) (most citations omitted) (footnotes omitted), the supreme court stated the following regarding conflicts of interest:

> Assistance of counsel in one's defense and the appointment of counsel if indigent is guaranteed by the Sixth Amendment to the federal constitution and by Article I, § 13 of the Louisiana Constitution. When counsel is required, the constitutional mandate for a fair trial requires counsel to be competent. The assistance of counsel is an essential right because it is the means by which a defendant asserts all other constitutional rights within our justice system. Therefore, when counsel has a conflict of interest, the conflict may thwart the assertion of a full defense to criminal charges.

> Such conflicts usually arise in the context of joint representation. However, joint representation is not per se illegal and does not violate the Sixth Amendment of the United States Constitution or Article I, § 13 of the Louisiana Constitution unless it gives rise to an actual conflict of interest.

> Generally, under our jurisprudence, "Indigent Defender Boards are . . . treated as the equivalent of private law firms to effectuate a defendant's Sixth Amendment right to effective assistance of conflict-free counsel and the ethical obligation of an attorney associated with other lawyers in a firm to avoid representing a client 'when any one of them practicing alone would be prohibited from doing so. . . .' La. Rules of Professional Responsibility, Rule 1.10(a)." *State v. Connolly*, 06-0540 (La.6/2/06), 930 So.2d 951, 954, n. 1; *State v. McNeal*, 594 So.2d 876 (La.1992).

Previously, in *State v. Carmouche*, 508 So.2d 792 (La.1987), on rehearing, the issue of a potential conflict of interest was raised during trial when the defendant's court-appointed attorney, Edward Lopez, learned that Ernest Jenkins, the prosecution's witness who would disclose the defendant's jailhouse confession

25

was his own client. Mr. Lopez told the court he may not be able to cross-examine the witness on certain topics because there could be a conflict of interest. The supreme court found this was sufficient evidence to alert the trial judge of an actual conflict of interest:

> Defendant's counsel was confronted with an actual conflict of interest when one of his clients was arguably the most damaging witness against a second client. When Lopez cross-examined Jenkins, one of his clients would suffer. If Lopez failed to raise a doubt as to Jenkins' credibility, Defendant's case would be seriously damaged. On the other hand, if Lopez were successful in his cross-examination, he could jeopardize Jenkins' plea bargain that had not yet been formalized.

*Id.* at 804. Acknowledging that the conflict of interest issue arose during trial rather than prior to trial, the supreme court stated the following regarding the trial court's responsibility:

> While being mindful of the restrictions inherent in the attorney/client privilege, the judge should require the attorney to disclose the basis of the conflict. If the judge determines that the conflict is not too remote, he should explain the conflict to the defendant outside the presence of the jury and inform the defendant of his right to representation that is free of conflict. Thereafter, if the defendant chooses to exercise his right, a statement should be prepared in narrative form, which indicates that the defendant is fully aware of his right but has chosen to make a knowing and intelligent waiver thereof. If the defendant opts not to waive his right to counsel that is free of conflict, the judge must offer the defendant and his counsel a mistrial under C.Cr.P. 775(1).
>
> Once the judge determines that a conflict of interest in fact exists, it is presumed that the conflict will affect the defense counsel's representation of his client. If the trial court fails to take the proper steps to protect defendant's right to effective counsel, a reversal of the conviction is required. As stated by the United States Supreme Court in *Glasser v. United States*, 315 U.S. 60, 75-76, 62 S.Ct. 457, 467, 86 L.Ed. 680, 702 (1942), "The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." In *Holloway v. Arkansas*, [435 U.S. 475, 98 S.Ct. 1173 (1978)], the Court found the holding in *Glasser v. United States*, [315 U.S. 60, 62 S.Ct. 457 (1942)], to be "whenever a trial court improperly requires joint representation over timely objection reversal is automatic."

26

[*Holloway*,] 435 U.S. at 489, 98 S.Ct. at 1181. This holding is applicable where defense counsel alerts the trial court during trial that he is faced with a conflict of interest and the trial judge orders counsel to continue without taking the proper steps to protect the defendant's right to counsel that is free from conflict.

*Id.* at 805 (some citations omitted). After determining that the trial court failed to take appropriate measures to protect Carmouche's right to conflict-free counsel, the supreme court reversed his conviction and sentence and remanded the matter for a new trial. *Id.*

Between deciding *Carmouche* and *Garcia*, after "conclud[ing] on direct appeal that the defendant did not knowingly and intelligently waive his right to conflict-free representation by appointed counsel," the supreme court, in *State v. Cisco*, 01-2732, p. 1 (La. 12/3/03), 861 So.2d 118, 120, *cert. denied*, 541 U.S. 1005, 124 S.Ct. 2023 (2004), reversed the convictions and sentence of a defendant who had been sentenced to death by lethal injection following his convictions of three counts of first degree murder. In its discussion of the conflict of interest issue, the supreme court noted that:

[T]he trial judge in this particular case could have taken a number of simple steps to safeguard the defendant's Sixth Amendment rights. . . . [F]or example, the trial judge could have easily appointed another attorney to represent the defendant, since on each occasion when the issue arose trial would not transpire for many months or years in the future.

*Id.* at 134.[10]

---

[10] The *Garcia* court distinguished *Carmouche* and *Cisco* on the basis that:

[T]here was no actual conflict in the attorneys' representation of defendant at trial because none of these attorneys' loyalties were divided[; n]one of his attorneys jointly represented other defendants to whom the attorneys owed duties of loyalty[, and n]one of defendant's counsel was called upon to cross-examine any of his former or current clients in the State's prosecution, mandating reversal.

*Garcia*, 108 So.3d at 45-46.

### Evidence at Trial

Before the cross-examination of Ms. Kibodeaux, one of Defendant's attorneys notified the trial court that his law firm had previously represented her.[11] The State posited that because Ms. Kibodeaux had no prior convictions, there would be nothing with which the defense could impeach her. Defense counsel responded that although he did not want to question Ms. Kibodeaux about any criminal convictions, he brought up the conflict issue because of his concern that it was ethically impermissible for a person's previous counsel to act against that person's legal best interest in any manner. Nevertheless, defense counsel expressed to the trial court his belief that a verbal consent by the witness would be sufficient. The trial court then allowed Defendant's attorneys, both of whom were employees of the Public Defender's Office and both of whom stated on the record that they did not recall ever personally representing Ms. Kibodeaux, to question her about the fact that she had been previously represented by members of their office. When told that "there might be a potential conflict of interest in us cross-examining you because of that prior representation," Ms. Kibodeaux acknowledged and waived any potential conflict, and the court recessed for the evening. Prior to the taking of evidence the following day, the State suggested to the trial court that it ought to conduct a colloquy with Defendant regarding the conflict issue. During that colloquy, the State responded:

> In this case we have Mr. Monroe and Mr. Flammang who stated that they did not actually represent the witness, Ms. Kibodeaux. So I don't believe it's a situation of actual conflict. I do think that it's a good thing that Mr. Monroe brought this to the attention of the Court.

---

[11] Defendant's attorney explained that his office had represented her in city court and in the Fourteenth Judicial District Court in conjunction with three misdemeanors and three felonies, but that he believed that all of those matters had been resolved.

Obviously he was acting as a professional in doing so. I just don't think that this rises to an actual conflict of interest situation.

After hearing arguments, the trial court found no actual conflict of interest existed and stated for the record:

Counsel having in their diligence suggested to this Court that this issue arose through the fault of no one, and that after the witness testified it was brought to Defense Counsel's attention and the State's attention that this witness may have been represented in a historical way by the Public Defender's Office.

In fact, Mr. Flammang pointed out that because of a filing system, there's no reason to believe that they're still not representing that client.

I think the distinguishing factor is set forth in *State vs. Garcia* and *State vs. Cisco* is that the present attorneys, Counsel and Co-counsel, have nothing to suggest and their records don't indicate that they have indeed in the past represented that witness.

So I think under *Garcia* and *Cisco* I don't think that a conflict would exist, and as a result thereof we should proceed with this trial. Anything further?

I want to note the objections on the record by Mr. Jim Flammang and his Co-counsel, Mr. Monroe, of the same.

After the court ruled, another defense counsel, Andrew Casanave, stated the following regarding the conflict issue:

*Cisco* was a case where the private defense attorney who was appointed was also the divorce attorney of the lead defective [sic] in a murder investigation, and it was a hotly contested divorce that she represented the detective in. And it would have been awfully easy for her to know that she had that conflict. It was painfully obvious she had that conflict.

The Public Defender's office is essentially a Law Firm, the second largest Law Firm in Calcasieu Parish after the District Attorney's Office. We deal in tens of thousands of files; and it is not as easy for us to know if and when we have a conflict.

I do find it interesting, I was the attorney Mr. Monroe referenced who the District Attorney tried to kick off of a murder case because we had previously represented the deceased. And I pointed

29

out to Judge Davis we had no duty to the deceased anymore because he was deceased.

I'm curious if and where the bright line is for the District Attorney's Office as far as our conflicts, because I would like all the guidance in the world.

Defense counsel Monroe then attempted to distinguish *Garcia*:

To preserve the record in an attempt to distinguish, the *Garcia* case that Ms. Sigler cited clearly states in the Court's reasoning when they're discussing the presence, or lack thereof, of a conflict of interest, they explicitly point out that none of the Defense's counsel was called upon to cross-examine any of his former or current clients in the State's prosecution.

This case is clearly distinguishable from that as was evidenced yesterday Mr. Flammang cross-examined Ms. Kibodeaux on the stand. I want to make sure that that was noted that the Court did rely on the fact that the lawyers in this case were representing three codefendants and there was no issue of a cross-examination of a current or former witness.

Finally, the State offered the following:

Yes, Your Honor, just to clarify the State's position, conflict of interest law like any other area of law is an evolving area of jurisprudence.

*Garcia* is the latest statement through the Louisiana Supreme Court, and *Garcia* is the position of the District Attorney's Office with regard to conflict of interest cases involving the Public Defender's office, because it is in fact the latest word of the Louisiana Supreme Court on that issue.

The trial court did not change its ruling. When the matter was raised again at the hearing on Defendant's motion for new trial, the trial court denied the motion.

### *Defendant's Argument on Appeal*

In his appellant brief, Defendant argues:

The trial court's ruling was incorrect even if Marlon's attorneys had not directly represented Ms. Kibodeaux. Marlon's attorneys worked for a law firm that has and/or is currently representing her in criminal matters. Thus, the conflict Ms. Kibodeaux's assigned-attorneys have in this case are also imputed onto Marlon's attorneys.

30

Since a timely objection was made prior to trial ending, the showing of an actual conflict requires reversal of Marlon's conviction.

Defendant further argues the trial court erred in failing to find an actual conflict. He further argues that despite Mr. Monroe having made statements indicating he did, in fact, represent Ms. Kibodeaux in the past, the trial court failed to investigate the extent of the "potential conflict."

Addressing the State's argument that Ms. Kibodeaux's lack of a conviction record showed no impeachment was possible, Defendant argues that "there could have been something in Ms. Kibodeaux's case or conversations with an attorney that could have directly related to her ability to be a credible witness in this case – i.e. history of not telling the truth." Defendant also suggests that Ms. Kibodeaux's active bench warrant meant her case was also active with the court. Thus, Defendant argues, "the 14th Judicial District [Public Defender's Office] and its attorneys [] still represented Ms. Kibodeaux at the time of her testimony against Marlon, creating an actual conflict."

### *The State's Argument on Appeal*

Although the State acknowledges that an attorney called upon to question a current or former client labors under a conflict of interest, the State contends in its appellee brief that no "actual conflict" existed in the present case:

> Mr. Monroe did not remember Cristin, nor his representation of her; he simply remembered her face. He exhibited no loyalty to her. He clearly did not represent her in any matters adverse to this defendant. His connection to her was minimal at best. Thus, any conflict would be too remote to have any effect on this matter.
>
> Nor can Defendant point to any instances in the record where either of his attorneys exhibited divided loyalties. The record reflects that this defendant was represented by two clearly competent attorneys, who advocated zealously on his behalf, resulting in a conviction of a lesser offense of aggravated battery from an attempted second degree murder charge. There was no "actual conflict." And if

there was no "actual conflict" as to Cristin, there could be no "actual conflict" as to Defendant.

Alternatively, the State submits that even if there was an "actual conflict," Ms. Kibodeaux waived it. In that regard, citing *State v. Smith*, 13-596 (La.App. 1 Cir. 11/1/13) (unpublished opinion),[12] the State contends that once Ms. Kibodeaux "waived the attorney-client privilege and voluntarily subjected herself to full cross-examination, including details of her prior drug use and possible impeachment of her previous testimony, the alleged conflict was removed." Moreover, the State submits that even "[a]ssuming *arguendo* that the conflict was not 'too remote,' it ceased once Cristin waived her potential conflict" because "[t]here was no longer a possibility of divided loyalties." Finally, the State contends that the trial court did not abuse its discretion in finding the conflict was too remote.

*Legal Analysis*

In the present case, the trial court was made aware of a potential conflict during trial. The trial court found, however, that there was no actual conflict because there was no indication that either one of Defendant's attorneys actually represented Ms. Kibodeaux. As Defendant argues in brief, however, the testimony is unclear as to whether Mr. Monroe actually represented Ms. Kibodeaux. Additionally, it appears that if another member of the Public Defender's Office represented Ms. Kibodeaux, that representation would be imputed to Defendant's attorneys as employees of the Public Defender's Office. Nonetheless, we conclude

---

[12] In *Smith*, 13-596, the defense counsel "claimed that he could not both zealously represent the defendant and protect the confidential information provided to him by Verret[, a trusty[ ] who on the fourth day of trial informed the State that the defendant had admitted to the crime when they were roommates.]" On appellate review, the first circuit held that "once Verret waived the attorney-client privilege and voluntarily subjected himself to full cross-examination, including details of his prior convictions and reasons for testifying, the alleged conflict was removed. Thus, the defendant's rights were adequately protected, and the district court did not abuse its discretion in denying defense counsel's motion to withdraw." *Id.*

that the evidence presented was insufficient to prove that either of Defendant's attorneys was operating under an actual conflict of interest. The fifth circuit addressed a factually similar case and found no actual conflict existed. *See State v. Kelly*, 14-241 (La.App. 5 Cir. 10/29/14), 164 So.3d 866, *writ denied*, 14-2499 (La. 9/25/15), 178 So.3d 163. The defense attorney in *Kelly* had previously represented one of the State's witnesses. Kelly argued that "an actual conflict arose when [his attorney] was required to cross-examine [the witness at trial,] that the conflict was not cured by a valid waiver and that the error . . . was not harmless." *Id.* at 877. The State contended, however, that no actual conflict existed because Kelly's attorney had "only represented [the witness] in her role as an indigent defender at a preliminary hearing in an unrelated matter." *Id.* Agreeing that no actual conflict existed, the fifth circuit explained:

> The phrase "actual conflict of interest" means "precisely a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties." *Mickens* [*v. Taylor*], 535 U.S. [162,] 171, 122 S.Ct. [1237,] 1243 [(2002)]. An actual conflict of interest arises when a defense counsel is "put in the unenviable position of trying zealously to represent Defendant at trial while simultaneously trying to protect the confidences of a former client who was testifying for the state against Defendant." *State v. Bell*, 04-1183 (La.App. 3 Cir. 3/2/05), 896 So.2d 1236, 1243, *writ denied*, 05-0828 (La. 11/28/05), 916 So.2d 143, *citing Carmouche*, 508 So.2d at 804. The facts presented in this case do not show that defense counsel was forced to labor under an actual conflict with clearly divided loyalties.

*Id.* at 879 (footnote omitted).

As in *Kelly*, we conclude that no actual conflict of interest existed in the present case when defense counsel cross-examined Ms. Kibodeaux. Ms. Kibodeaux did not testify *against* Defendant. Nothing in Ms. Kibodeaux's testimony specifically described Defendant as one of the perpetrators. Ms. Kibodeaux simply described the perpetrators as black and described one

33

perpetrator as being tall and the other perpetrator as being short. Ms. Kibodeaux's description of the two perpetrators walking away "nonchalantly" actually helped Defendant's theory that the perpetrator was not shot during the incident. Additionally, Ms. Kibodeaux did not recall seeing either of the two men limping as they walked away. Thus, Ms. Kibodeaux' testimony did not operate *against* Defendant's theory of misidentification.

Furthermore, the minutes indicate that Ms. Kibodeaux was represented by an attorney from the Public Defender's Office to answer bench warrants. There is no definite evidence that Ms. Kibodeaux was represented by either one of Defendant's counsel at trial. Finally, the State indicated that Ms. Kibodeaux had no prior convictions with which defense counsel could have impeached her.

Recently, in *State v. Tucker*, 13-1631, p. 37 (La. 9/1/15), 181 So.3d 590, 619, *cert. denied*, ___ U.S. ___, 136 S.Ct. 1801 (2016), the supreme court explained that even if a defendant proves an actual conflict, he still must show that a "lapse in representation" resulted from the conflict:

> "[O]nce Defendant establishes that there was an actual conflict, he need not prove prejudice, but simply that a 'lapse in representation' resulted from the conflict." [*United States v.*] *Iorizzo*, 786 F.2d [52,] 58 [(2d Cir. 1986)] (quoting *Cuyler* [*v. Sullivan*], 446 U.S. [335,] 349, 100 S.Ct. [1708,] 1718). To prove a lapse in representation, a defendant must "demonstrate that some 'plausible alternative defense strategy or tactic might have been pursued,' and that the 'alternative defense strategy was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.'" *United States v. Levy*, 25 F.3d 146, 157 (2d Cir. 1994) (quoting *Winkler* [*v. Keane*], 7 F.3d [304] at 309).

Defendant has neither alleged nor shown that his defense attorneys failed to adhere to an alternative defense strategy based on their loyalty to Ms. Kibodeaux. Thus, even if Defendant proved an actual conflict of interest existed between his

attorneys and Ms. Kibodeaux, Defendant still failed to prove a "lapse in representation."

For the foregoing reasons, we conclude that Defendant's second assignment of error lacks merit.

### Assignment of Error Number Three

Defendant asserts that the trial court erred in allowing the State to question Dr. Shimer, an expert in the field of general surgery, about medical reports and issues outside of his expertise. Defendant further alleges the State deliberately failed to give Defendant notice of such testimony. He further contends that the State's voir dire of Dr. Shimer failed to establish his expertise with regard to making findings concerning bullet trajectories, which prevented Defendant from conducting more than a rudimentary voir dire of Dr. Shimer's qualifications as an expert witness in the field of general surgery. The State counters that Defendant did not preserve this argument for appeal. Alternatively, the State submits that the trial court did not abuse its discretion in allowing Dr. Shimer to testify beyond the scope of his expertise, and, even if the trial court committed any error in that regard, such error was harmless.

Louisiana Code of Evidence Article 702 provides the following regarding testimony by experts:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (2) The testimony is based on sufficient facts or data;

35

(3) The testimony is the product of reliable principles and methods; and

(4) The expert has reliably applied the principles and methods to the facts of the case.

With respect to opinion testimony of experts, La.Code Evid. art. 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

In *Lewis v. B-N-D Garage & Towing, Inc.*, 10-163, pp. 7-8 (La.App. 3 Cir. 10/6/10) (unpublished opinion), we stated:

Comment (d) to Article 703 specifically references inadmissible hearsay, stating that it is allowable if it is reasonably relied upon by experts in forming their opinions. The comment provides that it is for the court to determine whether such hearsay "may be 'reasonably relied upon' in this fashion." La.Code Evid. art. 703, comment (d). Moreover, the fact that an expert's opinion is based on information not personally known to him affects the weight attributed to his opinion, not the admissibility of the opinion. *See Gagnard v. Zurich Am. Ins. Co./Assur. Co. of Am.,* 02-19 (La .App. 3 Cir. 6/12/02), 819 So.2d 489.

"The trial court is vested with wide discretion in determining the competence of an expert witness, and its ruling on the qualification of the witness will not be disturbed absent an abuse of discretion." *State v. Williams*, 615 So.2d 1009, 1022 (La.App. 1 Cir.), *writ denied*, 619 So.2d 543 (1993) (citing *State v. Trahan*, 576 So.2d 1 (La.1990)). "However an expert witness may not give expert testimony beyond the scope of the field of expertise in which he is qualified." *Id.* As the second circuit has explained, "[t]he test of competency of an expert is his knowledge of the subject about which he is called upon to express an opinion. A combination of specialized training, work experience and practical application of the expert's knowledge can combine to demonstrate that a person is an expert."

36

*State v. Franklin,* 42,055, p. 24 (La.App. 2 Cir. 5/09/07), 956 So.2d 823, 839, *writ denied,* 07-1489 (La. 1/11/08), 972 So.2d 1162.

During the trial, the State offered Dr. Shimer as an expert in general surgery. After the defense stipulated to Dr. Shimer's expertise in that field, the trial court recognized him as offered. Dr. Shimer testified that he treated the victim, Bradford Jacobs. When the State asked Dr. Shimer if he had occasion to look at Defendant's medical records, Defendant's attorney stated that he questioned the relevance of Dr. Shimer testifying as to Defendant since he never treated him. Thereafter, the State requested a bench conference. The jury was then removed from the courtroom and one of the State's attorneys argued to the trial court:

> I anticipated such an objection. Whenever we were preparing for trial - - Dr. Gray is the doctor who evaluated Marlon Thomas. His testimony is exceedingly relevant as he talks about the angle at which the bullet entered as well as then where the bullet was finally lodged and then removed. That testimony is going to be exceedingly relevant as we proceed further to trial.
>
> That being said, at the time we were preparing for trial Dr. Gray was out of the country. His staff had no idea where he was or when he would return. It turns out he has returned. We made contact with him today and apparently it would put a tremendous strain on the ER because he's the only doctor there in the ER.

After examining the issue in light of *Gagnard*, 819 So.2d 489, and La.Code Evid. arts. 702 and 703, and noting that trial courts are vested with "great latitude" in "granting expert status to witnesses," the trial court ruled that it would allow Dr. Shimer to testify regarding Dr. Gray's report. In doing so, the trial court recognized that defense counsel's concerns, while valid, could be sufficiently addressed in defense counsel's cross-examination of Dr. Shimer. The trial court then gave the attorneys a ten-minute break before allowing Dr. Shimer to return to the witness stand.

37

When Dr. Shimer resumed his testimony, he stated that he had reviewed Dr. Gray's report. The State then asked Dr. Shimer, from his review of the report, where the bullet entered Defendant. Dr. Shimer stated that the bullet entered Defendant's thigh above his knee and lodged in the lower part of his leg. Dr. Shimer was then shown photographs taken in the hospital which showed the wound on Defendant's leg. The State then elicited the following testimony:

Q. That was State's Exhibit 18 for the record. So, Dr. Shimer, we have an entry wound on the inner part of the thigh above the knee, and we have a lodging on the lower part of the leg. What, if anything, does that tell you about the trajectory the bullet was traveling?

A. That it was generally traveling in the general direction of the length of the leg away from the body.

Q. So, I know there's a lot of factors that would have played, but if you have a shot that comes [into] the inner part of the leg above the knee and lodges itself below, is it fair to say the shot would have come from above? Would it come horizontally? I mean, from what angle would the shot have come?

A. The shot would have come from above the thigh, but it also depends on what direction the thigh was in when the shot was fired. So, if you're asking me if it was shot from above, I couldn't say that.

. . . .

Q. But as you were talking about before, in your common sense, ordinary life experience, if we assume the leg was in normal posture, say for instance my leg, in a normal posture like this, not being upside down or not laying on the ground, if my leg is in normal posture like so, then the shot would have come from above; is that a fair assumption?

A. If you had that injury and it - - you were standing when that occurred, yes, the shot would have come from above.

On cross-examination, Dr. Shimer testified that he did not treat Defendant, that he had received Defendant's records for the first time that day, and that he had reviewed the records for about half an hour prior to his testimony. When asked if he was an expert in gunshot wounds, Dr. Shimer responded that he was "an expert

38

in treating gunshot wounds" but not in the field of ballistics.  Dr. Shimer testified that with his medical training, he felt comfortable testifying as to how a bullet moves through various parts of the body.  The following colloquy then took place between the defense and Dr. Shimer regarding his opinion as to the trajectory of the bullet:

> Q.    When Mr. Sudduth and you spoke, you talked about the fact that the way the wound looked to you indicated that the shot came from above the entry wound.
>
> A.    Correct.
>
> Q.    What I was asking is does the angle at which that entry wound is made, can you draw any conclusions about the angle at which that was made, the distance it was made from the entry wound or where it ended up?
>
> A.    I don't think I could say how far the gun was away from the puncture site.
>
> Q.    That's what I was asking.  You don't feel like you can determine the distance away the shot was made.
>
> A.    I - - not from looking at the wounds here, no.
>
> Q.    It's not possible for you to say what position Mr. Thomas' leg was in when that shot occurred?
>
> A.    I would say that the firearm was in the general same direction as what the leg was at the time that it sustained an injury.
>
> Q.    So, if Mr. Thomas was laying on the ground, the gun would have been - -
>
> A.    If he was laying on the ground with his legs extended?
>
> Q.    Yes, sir.
>
> A.    It would be more of a horizontal aim of the weapon.  If he was standing up, it would have been more aimed down.  If his foot was straight in the air, the gun would have been pointed in that direction.

## Defendant's Argument on Appeal

In brief, Defendant claims he was not given any notice that Dr. Shimer would be qualified as an expert in any field. While Defendant acknowledges that he stipulated as to Dr. Shimer's expertise as a surgeon, he nonetheless contends that the State did not establish Dr. Shimer's expertise in bullet trajectories nor did it give him notice of its intent to introduce Dr. Shimer as an expert in bullet trajectories. Defendant contends that "the issue was never the State's use of a report prepared by another doctor," but was instead its "questioning Dr. Shimer outside the scope of his expertise." He further contends that the trial court's conclusion that his opportunity to cross-examine Dr. Shimer would remedy his concerns was erroneous and prejudicial to his defense. Defendant argues on appeal that "the State's tactic ran afoul of Louisiana Code of Criminal Procedure Article 719(A) that places an affirmative duty upon the State to, at the very least, disclose the "name of the expert witness, his qualifications, a list of materials upon which his conclusion is based, and his opinion and the reason therefor." Finally, Defendant questions the actual purpose for which the State offered Dr. Shimer's testimony, stating:

> Thus, the State's attempt to hide the true nature [of its reason for] calling Dr. Shimer clearly violated the discovery obligations upon the State to provide notice to the defense in order to guarantee a full and fair trial.
>
> . . . .
>
> Marlon's prejudice in this matter rested on the fact that while his story about his whereabouts at the time of the shooting were suspicious, they could not otherwise be disproven by the State. The only thing that proved Marlon may have lied about anything, and thus undermined his whole story, was whether he was shot in the leg by someone driving in a car while he was walking (shot at horizontal angle) versus whether he was shot at a downward angle (shot at

40

vertical angle), likely by himself. As stated in Assignment of Error No. 1, the physical evidence in this case was circumstantial at best. The only evidence the State offered to attack Marlon's credibility had to do with the bullet wound to his own leg. Thus, without the trial court's incorrect ruling, the balance of the State's evidence was not sufficient to prove guilty [sic] beyond a reasonable doubt.

### The State's Argument on Appeal

In its brief, the State contends that Defendant failed to formally object to the State's questioning of Dr. Shimer relative to the bullet wound suffered by Defendant or to the trial court's decision to allow Dr. Shimer to testify in that regard. It points out that during the bench conference concerning Dr. Shimer's testimony, defense counsel stated, "I think Dr. Shimer could review [Dr. Gray's] reports and come to his own conclusions and testify as to those." The State further contends that Defendant made no argument at trial regarding any discovery violations allegedly committed by the State. As such, the State submits that Defendant's argument regarding any impropriety in its use of Dr. Shimer's testimony was not preserved for appeal.

### Legal Analysis

Louisiana Code of Criminal Procedure Article 841 provides in pertinent part, "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of the occurrence." It is clear that Defendant failed to complain of any discovery violations in the trial court. Accordingly, we conclude that Defendant has waived review of those issues. The question of whether Dr. Shimer testified beyond his expertise, however, is not as clear. While defense counsel questioned the possibility that Dr. Shimer's testimony regarding the pathology of gunshot wounds was beyond Dr. Shimer's expertise, no specific objection was made to any portion of Dr. Shimer's testimony. Without any specific objection, it

41

is impossible for this court to determine which specific testimony Defendant finds objectionable. Nevertheless, we will address Defendant's argument that Dr. Shimer was allowed to testify beyond his expertise. In a case with similar expert testimony, the first circuit stated the following:

> In any event, while the doctor had qualified in this case only as an expert in the cause of death and not in the area of ballistics, he could testify to the existence of powder burns, a matter of which he had gained personal knowledge through his observations during the autopsy. *See* La.Code Evid. Arts. 602 and 703. On the other hand, the doctor's testimony concerning his approximation of the distance from which the gun was fired to produce the powder burns and the various factors related to the production of powder burns appears to exceed the scope of his field of expertise. Nevertheless, this testimony, relating to the approximate distance from which it might be inferred that either of the fatal shots were fired, was harmless beyond a reasonable doubt. *See* La.C.Cr.P. art. 921; *State v. Henderson*, 352 So.2d 206 (La.1977).

*Williams*, 615 So.2d at 1022-23.

Similarly, in the present case, Dr. Shimer testified within his expertise as a general surgeon when he testified as to the point at which the bullet entered Defendant's body as well as the movement of the bullet once it entered Defendant's body. As Dr. Shimer, admitted, however, he was not an expert in ballistics. Thus, Dr. Shimer's testimony regarding the trajectory of the bullet before it entered Defendant's body may have been beyond his expertise. Nonetheless, we find that any such error was harmless. First, the defense cross-examined Dr. Shimer on the trajectory of the bullets, causing Dr. Shimer to eventually conclude only that the firearm was in the general same direction as Defendant's leg when Defendant sustained the injury. Dr. Shimer could not tell what position Defendant's leg was in; thus, he could not tell whether the leg was horizontal or vertical. Based on this inconclusiveness, we conclude that Dr. Shimer's testimony did not prejudice Defendant. Secondly, the sufficiency of

42

the State's evidence was not dependent on Dr. Shimer's testimony. The physical fact that Defendant was shot, regardless of the bullet's trajectory, along with the DNA evidence linking Defendant to the glove found in the victim's bathroom, was sufficient to convict Defendant. *See e.g., State v. Washburn*, 16-335 (La.App. 3 Cir. 11/2/16), 206 So.3d 1143 and *State v. Wommack*, 00-137 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62.

For the foregoing reasons, we find that the trial court did not abuse its discretion in allowing Dr. Shimer to testify about Defendant's bullet wound. Moreover, even if we were to find that Dr. Shimer testified beyond his expertise, we conclude that any such error was harmless. Thus, Defendant's third assigned error is meritless.

### Assignment of Error Number Four

In his final assignment of error, Defendant contends that the trial court erred in denying his motion for new trial that was based upon what he alleged to be an improper argument made by the State in its closing arguments. The comments related to Defendant's consent or non-consent to his blood being drawn.

Louisiana Code of Criminal Procedure Article 851 provides in pertinent part:

A. The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegation it is grounded.

B. The court, on motion of the defendant, shall grant a new trial whenever any of the following occur:

(1) The verdict is contrary to the law and the evidence.

(2) The court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error.

. . . .

43

(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.

"The ruling on a motion for new trial is committed to the sound discretion of the trial judge and will be disturbed on appeal only when there is a clear showing of an abuse of that discretion." *State v. Viree*, 95-176, p. 8 (La.App. 3 Cir. 3/6/96), 670 So.2d 733, 737, *writ denied,* 96-885 (La. 9/20/96), 679 So.2d 431.

Louisiana Code of Criminal Procedure Article 774 states the following regarding the scope of closing arguments:

The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.

The argument shall not appeal to prejudice.

The state's rebuttal shall be confined to answering the argument of the defendant.

Regarding the appropriateness of a mistrial based on improper argument, La.Code Crim.P. art. 770 provides:

Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:

(1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;

(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;

(3) The failure of the defendant to testify in his own defense; or

(4) The refusal of the judge to direct a verdict.

An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish

the jury to disregard the remark or comment but shall not declare a mistrial.

According to La.Code Crim.P. art. 771, an admonition is appropriate in certain circumstances:

In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:

(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or

(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.

In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

The supreme court has stated the following regarding a motion for a mistrial under La.Code Crim.P. art. 770(3), a comment made about a defendant's failure to testify:

"Direct" and "indirect" references to the defendant's failure to take the stand are prohibited by article 770(3). *State v. Johnson*, 541 So.2d 818, 822 (La.1989). "When the prosecutor makes a direct reference to the defendant's failure to take the stand, a mistrial should be declared, and "it is irrelevant whether the prosecutor intended for the jury to draw unfavorable inferences from defendant's silence."' *Id.* (citing [*State v.*] *Fullilove*, 389 So.2d [1282,] 1284 [(La.1980)]. When the reference to the defendant's failure to take the stand is not direct, this Court will inquire into the remark's "intended effect on the jury" in order to distinguish indirect references to the defendant's failure to testify (which are impermissible) from statements that are not (which are permissible, though not favored). *Johnson*, 541 So.2d at 822; *Fullilove,* 389 So.2d at 1284; *State v. Jackson*, 454 So.2d 116, 118 (La.1984). In order to support the granting of a mistrial, the inference must be plain that the remark was intended to focus the jury's attention on the defendant's not testifying.

45

*State v. Mitchell*, 00-1399, pp. 4-5 (La. 2/21/01), 779 So.2d 698, 701.

### <u>Evidence at Trial</u>

During its rebuttal closing argument, the State asserted the following:

On the second page when the nurse gives her details in there, in the same report, he didn't consent to his blood being drawn, Ladies and Gentlemen. He objected. The Defense knows that. It was a court order to get his blood drawn.

Why be so willing to submit to a polygraph but refuse the blood? Well, the polygraph is inadmissible. The blood speaks; the blood has power; the blood won't lie; and the blood is what tied him to the apartment. That's why he didn't consent to the blood, he consented to the polygraph. That's why he wasn't willing to have his blood taken, which would reveal, as Monica Quaal said, the building blocks of who he is.

At another point in its rebuttal argument, the State mentioned that Defendant's DNA was obtained from a court order because Defendant would not consent to have it drawn for "obvious reasons." Later, the State argued:

Remember all the DNA was tested. Everything was tested. The blood on the sill there on the back of the door, that blood was tested for Bradford Jacobs['] blood when he was shot. The gloves were tested and came back Deonte Dougherty [sic] and Marlon Thomas.

Yes, three black males. That was only tested for blood, gloves, and DNA that we ever got, any traces of it. And if this Phantom that's been conjured this week about Joshua Plummer had any merit, where was the effort made? Why didn't he just consent to his own blood being drawn?

Marlon Thomas didn't consent because he knew the truth. He knew he was behind that house, and he knew he was involved in this calculated plan to rob and if he had to, to kill.

After the State's argument and prior to the trial court's instructions to the jury, Defendant notified the court of its objection to the State's argument regarding Defendant's refusal to consent to his blood being drawn:

MR. FLAMMANG:

Your Honor, and I would invite you to examine S-44 for yourself. Mr. Sudduth characterized Marlon Thomas as - - he said he refused to have his blood drawn and that it required a court order. I'm looking at the consent form which Marlon Thomas signed, Suspect consent for forensic nurse exam and their consent.

There is a little narrative attached that says "He refuses to have his blood drawn because his understanding was for Det. Fondel to be present and have it drawn along with Bradford Jacobs[']. The patient says he will not freely volunteer blood sample until Bradford Jacobs is present for his blood draw.

Once Det. Fondel present [sic] he explained to patient, Bradford Jacobs, blood was drawn already. Patient ready to sign same consent and proceed. Patient watched and verified as I labeled purple top tube, his name and date of birth. He verified I wrote his name, date of birth correctly before and after blood drawn."

There is no court order in here, Your Honor. There is no court order. My client consented to have his DNA drawn. We were asking to have his DNA drawn, Your Honor.

. . . .

MR. FLAMMANG:

That's a gross mischaracterization of what's in the evidence, Your Honor.

. . . .

THE COURT:

Do you have a motion?

MR. MONROE:

Yes, Your Honor. At this time Defense would make a motion for mistrial due to prosecution's mischaracterization which should be clear for the record in closing statements by insinuating that Mr. Thomas did not consent to have his blood drawn and submitted for DNA testing, as well as insinuating that there was a court order requiring such before this draw occurred.

THE COURT:

State?

47

MR. SUDDUTH:

Your Honor, there is a reason I did not introduce State's 44 during my close, though I did consider it, because it mentions exactly what Mr. Flammang said, which is that he wanted Det. Fondel to be there in order for his blood to be drawn. Once Fondel showed up, he did it.

However, there is a court order signed by Judge Savoie for Marlon Thomas to get his blood drawn. That is the court order that I was referring to. To say there's not a court order - -

THE COURT:

You're suggesting - - the Defense is telling that it does not exist, court order for the withdrawal evidence from the defendant.

MR. FLAMMANG:

Your Honor, the Judge ordered it done because we were asking to have it done and there had been plenty of delays.

THE COURT:

So there is a court order.

MR. FLAMMANG:

There may well be, Your Honor. I don't have it.

THE COURT:

I think it's vital to your request of the grant for this Court to consider a mistrial. Do you have - -

MR. FLAMMANG:

The problem is, though, it's a gross mischaracterization of the court order. They say he didn't consent when it says here he did.

THE COURT:

Indeed. My question to you is you're asking this Court to consider a mistrial when suggesting number one: there was a mischaracterization in closing by the State; and number two: that it does not exist[,] a court order for the draw of blood by division "A" in this Court?

. . . .

MR. FLAMMANG:

Okay, Your Honor. This is to me ancient history because this was a while ago. As I recall, we had filed a motion for bond reduction and we wanted the DNA testing done prior to that and there had been delay after delay after delay because of problems with the lab. And finally it came to a head. And yes, I do believe he did order it done, but I believe it was an order more directed at the lab to do it than for us to provide it.

The trial court denied the request for a mistrial and admonished the jury as follows:

There was a short part of the closing phase that I want to bring to your attention and what the Louisiana law would suggest is an admonition.

What that means is that I'm going to ask you to disregard a small portion of what was said at the conclusion of the State's remarks. The State may have suggested and you may have remembered that the State suggested they had to get a Court order to draw blood because Defendant refused to draw blood. I want you to disregard that statement. That was not in the evidence and I feel as though you should know that before I read the instructions to you.

Actually, my instructions will tell you how you should deal with that statement as I read them to you. So I want the record to reflect that the Court admonished the Jury in that respect.

The trial court subsequently instructed the jury to consider only evidence that was introduced at trial and not to consider evidence that it was instructed to disregard. The trial court further instructed the jury that closing arguments were not evidence. The State's comments during closing argument were once again challenged by Defendant in a motion for new trial, which the trial court denied.

### *Defendant's Argument on Appeal*

In his brief to this court, Defendant raises the same argument asserted in his motion for new trial:

Under the *Sixth Amendment* and La.Const. art. I, § 16 of [sic] Marlon had no obligation to testify or produce evidence. In accordance with

these rights, a rule "has long been in place prohibiting the State from commenting on a defendant's failure to testify or produce evidence in closing arguments." *Griffin v. California*, 380 U.S. 609 (1965). Nevertheless, the State brought up a court order requiring Defendant to submit DNA during closing argument, creating the impression that he was reluctant to provide this evidence.

Compounding the error, the State grossly mischaracterized the circumstances leading up to the collection of DNA from Defendant. On several occasions Defendant offered to have his DNA tested, and was delayed by technical issues beyond his control. When his DNA was eventually obtained, it was done pursuant to a consent form signed by Defendant. Nevertheless, the State presented an argument designed to lead the jury to believe that Defendant did not willingly cooperate with the investigation. This is improper under La.C.Cr.P. art. 770 and La.C.Cr.P. art. 774, and should have resulted in a mistrial per La.C.Cr.P. art. 770, which states that "[a]n admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial" if the State comments on the right of a defendant not to testify or produce evidence. The court should have granted the motion for new trial. This Court should not do the same.

## *The State's Argument on Appeal*

The State argues that the comments made in its closing argument were not direct comments regarding Defendant's failure to testify. However, even if considered indirect comments upon Defendant's failure to testify, the State contends the intended effect of the argument was not to focus on Defendant's failure to testify but to rebut his claim of misidentification. Finally, the State argues that its comments did not influence the jury's verdict, considering the credible witnesses and DNA results from which Defendant could not be excluded. Thus, the State concludes the trial court did not err in denying Defendant's motion for mistrial and the motion for new trial.

## *Legal Analysis*

The State's remarks in closing argument regarding Defendant's failure to consent to DNA evidence were not direct references to Defendant's failure to testify. The question is whether the comments were impermissible indirect

references to Defendant's failure to testify. An example of an impermissible indirect reference to Defendant's failure to testify was described in *Mitchell*, 779 So.2d at 701, as a situation where "defendant is the only witness who can rebut the state's evidence," and the State refers to the testimony at trial as "uncontroverted." "Such a reference to the testimony as uncontroverted focuses the jury's attention on Defendant's failure to testify and warrants a mistrial. *State v Perkins*, 374 So.2d 1234, 1237 (La.1979); *Fullilove*, 389 So.2d 1282 (La.1980); *State v. Harvill*, 403 So.2d 706, 711 (La.1981)." *Id*.

The court in *Mitchell* found the State's comment in that case was not an impermissible indirect reference to Mitchell's failure to testify since the comment did not focus the jury's attention on Defendant's failure to testify. The State in *Mitchell* made the following statement in its rebuttal argument: "'Where's the weapon? One person knows where the weapon is. One person.'" *Id.* at 700. The supreme court stated the following about the statement:

> During the trial, Jason Papillion testified that the defendant told him that he threw the gun away while traveling from Breaux Bridge to Lafayette. That testimony was the only evidence regarding the whereabouts of the weapon, which of course, was not introduced into evidence. There was testimony that the bullet retrieved from Alton Francis, Jr. was a fired [sic] from an automatic weapon (a .380 Larson). Papillion's testimony that defendant told him he had thrown the gun away explained why the state was unable to produce the murder weapon.
>
> The prosecutor believed it was important to the State's case that the jury understand why the murder weapon was not put in evidence by the State. That belief on his part was not unrealistic. . . .
>
> . . . .
>
> Taken in this context, the words "Where's the weapon? One person knows where the weapon is. One person." do not necessarily focus upon the defendant's failure to take the stand. Nor do they support the likelihood that the prosecutor intended to do so. The comment comes across as an explanation for the State's inability to

51

introduce the murder weapon because the defendant threw the weapon away while he was traveling from Breaux Bridge to Lafayette.

We conclude that the jurors more than likely would not have received the words of the prosecutor as an invitation to draw an admission of guilt from the defendant's failure to testify, but rather as a reason for why the jury should not penalize the State for its failure to enter the murder weapon into evidence.

*Id.* at 702.

Likewise, we conclude that the comments made by the State in the present case were not intended by the State as an invitation to the jury to draw an admission of guilt from Defendant's failure to testify. In its brief, the State asserts the comments were intended to rebut Defendant's claim of innocence and misidentification. We further note that in Defendant's closing argument, defense counsel mentioned the fact that the State did not give Defendant a lie detector test. In its rebuttal, the State first mentioned Defendant's refusal to consent to his blood being drawn as a comparison to Defendant's apparent willingness to submit to a lie detector test. The State implied Defendant knew the lie detector test would be inadmissible, but the blood results would be admissible. Thus, the State's comments regarding Defendant's refusal to consent to his blood being drawn could have been intended to combat Defendant's implication that he would have submitted to a lie detector test if offered. Although the comments were intended to suggest Defendant's guilt, they were not intended for the jury to draw an admission of guilt from Defendant's failure to testify. Thus, the State's comments were neither a direct or impermissible indirect reference to Defendant's failure to testify. Consequently, a mistrial was not mandated by La.Code Crim.P. art. 770(3).

Defendant also argues the State's comments were a mischaracterization of the circumstances surrounding the drawing of Defendant's blood as well as a comment on matters not in evidence. The supreme court has explained:

> [B]efore this court will reverse on the basis of improper argument it must be thoroughly convinced the jury was influenced by the remarks and such contributed to the verdict. "In making this determination, the court gives credit to the good sense and fair-mindedness of the jury." [*State v.*] *Eaton*, 524 So.2d [1194,] 1208 [(1988), *cert. denied*, 488 U.S. 1019, 109 S.Ct. 818 (1989)].

*State v. Williams*, 96-1023, p. 15 (La. 1/21/98), *opinion corrected*, (La. 5/28/98), 708 So.2d 703, 716, *cert. denied*, 525 U.S. 838, 119 S.Ct. 99 (1998).

It is unclear from the arguments below whether the State's comments were a mischaracterization of the circumstances surrounding the drawing of Defendant's blood. The State does not refer to any testimony in the record where Defendant's consent or non-consent was discussed.[13] Nonetheless, the possible influence the State's comments had on the jury does not rise to the level of thoroughly convincing this court that they improperly influenced the jury's verdict. The State's case consisted of physical evidence that Defendant was shot in the leg as well as testimony that one of the perpetrators had been shot. The bullet retrieved from Defendant's leg was the same caliber as the shell casings found at the scene. Most importantly, Defendant could not be excluded as a contributor to DNA retrieved from a glove found in the bathroom of the victim's apartment. Whether or not Defendant consented to the blood test which ultimately revealed this DNA evidence does not detract from the evidence itself.

---

[13] The State cites to the nurse's notes (State's Exhibit 44) but not to any specific testimony about the notes.

Based on the foregoing, we find no abuse of discretion in the trial court's denial of Defendant's motion for new trial. Thus, Defendant's fourth and final assignment of error lacks merit.

## DECREE

Defendant's convictions are affirmed. The trial court is directed to correctly inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of the opinion and to file written proof in the record that Defendant received the notice.

**AFFIRMED.**