STOKER, Judge.
Defendant, Alan C. Hunter, was convicted by a jury of armed robbery, a violation of LSA-R.S. 14:64. He was sentenced to twenty years imprisonment at hard labor without benefit of probation, parole or suspension of sentence. Defendant appeals his conviction based on eleven assignments of error. We reverse and remand for a new trial under Assignment of Error 1. Therefore, the other assignments are not considered.
FACTS
Defendant, Alan C. Hunter, was charged by bill of information with the offense of armed robbery, a violation of LSA-R.S. 14:64, in that on or about August 15, 1988, while armed with a dangerous weapon, to wit, a bottle, he robbed Lois Price.
The victim, Lois Price, was working as a store clerk at a convenience store on MacArthur Drive in Alexandria, Louisiana on August 15, 1988. Shortly before midnight, two black males entered the store but left without making a purchase. The two men returned a short time later and separated once they entered the store. One of the men, later identified as the defendant, approached Mrs. Price at the check-out counter and requested a one-fifth bottle of liquor. The victim retrieved the bottle from an upper shelf from behind the counter. She returned to the register at the counter, rang up the purchase, and told the defendant the price. At this time she was struck on the back of the head and she fell to the floor.
*835 The defendant went to the cash register and attempted to open it, at the same time yelling at the victim not to look at him. Unsuccessful at opening the register because it was jammed, defendant grabbed her by the hair and demanded that she open the register. She could not. Defendant grabbed the bottle from the counter and threatened the victim as he stood above her with the bottle raised in his hand. Defendant then kicked the victim as she knelt on the floor. He again tried unsuccessfully to open the register. Finally, defendant grabbed the entire cash register, removed it from the counter and left the store with the register. The victim then called the police to report the robbery.
About one hour later, the defendant was seen at another convenience store on Masonic Drive. Juanita Manual, the store clerk, saw the defendant and another black male enter the store and separate. The other man approached Manual and purchased a cigarette lighter from her using a handful of nickels to pay. Moments later, she was hit on the head from behind as she turned to check the price of beer for the defendant. She fell to the floor. The defendant then left the store, taking with him the entire cash register.
Several days later, the defendant was identified from a photographic lineup by both Manual and Price. In addition, at trial Mrs. Price testified that she recognized the defendant because she had seen him before on several occasions at the store.
OPINION
ASSIGNMENT 1.
Defendant contends the trial court erred in failing to grant his request for a continuance and thus denied defendant due process of law where the State failed to produce exculpatory fingerprint evidence which it possessed.
On November 30, 1988, defendant filed a Brady motion for exculpatory evidence and a more general discovery motion which encompassed Brady material, with which the State was ordered to comply by January 5, 1989. On January 14, 1989, defendant filed a Brady motion specifically requesting fingerprint evidence which was obtained from the crime scenes. On February 2, 1989, defendant and the State entered into a joint stipulation in which the State would permit defendant to see its file in order to satisfy compliance with two of defendant’s discovery motions. The State did not comply with defendant’s request for fingerprint evidence and the trial court granted a joint motion for continuance on February 13, 1989. On Tuesday, February 21, 1989, defendant again moved to continue the trial on the basis that the State did not provide him with the fingerprint evidence until Friday, February 17, 1989. (Monday, February 20, was a State holiday.) Defendant’s former attorney testified at the hearing as to his attempts to view the prints, as follows:
“Q But pursuant to the Motion for Bill of Particulars, which included the request for exculpatory evidence, and pursuant to the Motion for Discovery and Inspection, which equally requested exculpatory evidence, did you then enter into a stipulation with the State?
A Yes, I did. I believe I signed the stipulation myself, a joint stipulation with the State, that we had received their copy of the file.
Q And did they tender a copy of their file allegedly to you?
A Yes, they tendered it to Mr. Wheelis and then I — I got it from Mr. Wheelis.
Q Okay. Did you determine whether or not that that copy contained any fingerprint information?
A It did not.
Q When did you first learn of the fingerprint information?
A I learned of the fingerprint evidence — that—going through the file in preparation for trial, I discovered that there wasn’t anything, no reports about the results of fingerprint dusting that took place in there, as far as what the results were — whether or not they had positive identifiable fingerprints, and also there weren’t copies of the fingerprints themselves — the la *836 tent prints that were taken from the crime scene were not in the file.
BY THE COURT: Excuse me just a moment, again. Mr. Shannon, was a fingerprint analysis made?
BY MR. SHANNON: Your Honor, there were some prints lifted at both places. I think the file indicates there were prints lifted. There were not copies of the prints in the file, but the file indicated that there were some prints lifted.”
* * * * ⅜ *
“Q When — were you in court and did you make a — did you file a specific motion requesting this after you found out that they did have this — did you then file another request?
A Yes, I filed a Brady Motion that specifically asked for the fingerprint information and this was on the 13th, but the motion — I brought the motion to court. I didn't actually file it until the 14th. Just an oversight on my part, but Mr. Buck and I discussed the motion, discussed the fact that I hadn’t been provided with the fingerprint information, and he said — at that point we agreed, before Judge Polk, that it would be continued for a week so that I could get all of the fingerprint information.
Q Okay, and when did you obtain that information?
A Mr. Buck agreed to provide me with the information on Monday, and I didn’t receive it for a couple of days, but he was in trial. I didn’t say anything about it. Then on Thursday I — I addressed a letter to him and I came over. I brought the letter. Mr. Buck at that time told me Mr. Shannon was ■taking over the case, so I went to see Mr. Shannon with it, and Mr. Shannon — at that time I asked if I could go see the fingerprints myself, and he said — or I could go get the information myself — and he said — there was some reason, that the people were out or something like that. The reason I couldn’t do it that day. He said Friday morning would be the soonest that I could get them. And at that time I expressed my concern about being able to line up an expert witness in time, if one would be necessary. On Friday I got a call — I was in the courthouse, but my office got a call at 10:35 from the D.A.’s office relating that I could come look at the fingerprint evidence and — or come get the fingerprint information. So I found that out by calling my office. I went to the D.A.’s office and they provided me with the — with photocopies of photocopies of the latent fingerprints.
Q So you’re talking about the double photocopy.
A Double photocopies. I — I then took these to an expert.
Q Would that be Mrs. Doughty?
A That was Mr. Bolen. I took them to Mr. Bolen and he told me that — he’s a retired — I believe he was formerly with the City. He told me that — that the Xerox copies weren’t going to do it. He also stated that his eye sight was not what it used to be and he had been out of the business for awhile, and he was not willing to testify. I’d have to find myself another expert. So then I went back and I talked to Mr. Shannon about it. I told him that the — that the photocopies weren’t going to be suffi- ■ cient, and he told me that I could go view the — this was at 2:00 p.m. — he told me I could go view the evidence myself, bring an expert, and he called and made arrangements for me to do that.”
The prosecuting attorney explained that the State’s file indicated that fingerprints had been lifted, although they were not in the file, and that they were of inferior quality. The State also pointed out that defendant did not ask to see the original prints until Friday at 2:00 p.m.
The trial court denied defendant’s motion for a continuance because: (1) the State did not intend to use the prints at trial since they could not be matched to defendant’s fingerprints, (2) the new defense attorney should not have accepted a retainer if he was not able to be ready for trial on Febru *837 ary 21, and (3) the case had already been continued twice.
LSA-C.Cr.P. art. 718 mandates disclosure to the defendant by the State of any relevant exculpatory material in its possession or control. This rule has been broadened to encompass evidence which may impeach the credibility of a witness whose testimony may be determinative of guilt or innocence. United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), and cases cited therein.
In Bagley the court set forth the standard for determining the materiality of undisclosed evidence:
“We find the Strickland [v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)] formulation of the [United States v.] Agurs [427 U.S. 97, 104, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976)] test for materiality sufficiently flexible to cover the ‘no request,’ ‘general request,’ and ‘specific request’ cases of prosecutorial failure to disclose evidence favorable to the accused: The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A ‘reasonable probability’ is a probability sufficient to undermine confidence in the outcome.”
⅜ * ⅝ Sfc ⅝ ⅝
“We agree that the prosecutor’s failure to respond fully to a Brady [v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)] request may impair the adversary process in this manner. And the more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption. This possibility of impairment does not necessitate a different standard of materiality, however, for under the Strickland formulation the reviewing court may consider directly any adverse effect that the prosecutor’s failure to respond might have had on the preparation or presentation of the defendant’s case. The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor’s incomplete response.” 473 U.S. at 682, 105 S.Ct. at 3383.
This standard has been adopted in Louisiana. See State v. Rosiere, 488 So.2d 965 (La.1986).
We find that the State’s unexplained delay in making the fingerprint evidence available to defendant was unreasonable and unwarranted. The fact that a poor quality photocopy of a photocopy was provided by the State prior to trial instead of giving defendant ready access to the originals is hardly in keeping with the spirit and intent of the discovery rules, LSA-C. Cr.P. arts. 716-729.6. The purpose of the discovery rules is to identify and inform the opposing parties of the contested issues. State v. Lee, 510 So.2d 1378 (La.App. 3d Cir.1987). Moreover, merely giving the defendant access to the district attorney’s file is insufficient compliance with discovery if the State has other exculpatory evidence in its possession. See State v. Lee, 531 So.2d 254 (La.1988).
However, the relevant issue under Bagley is whether there is a reasonable probability that the outcome of the proceeding would have been different had the evidence been disclosed. In this case there was a late disclosure of evidence, so this court must determine whether the late disclosure so prejudiced defendant that he was denied a fair trial. State v. Smith, 430 So.2d 31 (La.1983); State v. Cook, 535 So.2d 988 (La.App. 4th Cir.1988).
The State presented testimony by the officers who investigated the Price and the Manual robberies that they had lifted fingerprints from the bottle of whiskey with which defendant allegedly struck Price, from the twelve-pack of beer defendant *838 allegedly brought to the counter at Manual’s store and also from the cooler door the defendant allegedly opened to get the beer. The officers, who were not qualified as experts in fingerprint analysis, testified that the prints were incomplete or smudged and that they could not match them to defendant’s fingerprints. Defendant’s expert did not have time to analyze and compare the prints. Defendant argues that he was prejudiced by the late disclosure because, had he had more time, he may have been able to use the fingerprints to find the real perpetrator of the offenses and to impeach the credibility of the victims’ testimony by showing that they had misidentified him. Thus, he was denied his right to a fair trial.
Similar situations were presented in State v. Smith, supra; State v. Arnaud, 412 So.2d 1013 (La.1982), and State v. Cook, supra. In those cases the courts refused to find the trial courts erred in failing to grant defendants’ motions for mistrial, stating that if defendants had truly needed more time to pursue a possible defense through the late disclosed evidence, the proper remedy was to request a continuance or a recess, rather than a mistrial. In the case before us, however, it is the trial judge’s refusal to grant a continuance that is at issue. Although the trial judge did not wish to continue the trial a third time, we have determined from the record that at least one of the prior continuances was granted in order to afford the State more time to comply with the discovery motions.
Given the fact that Price vehemently and positively asserted at trial that defendant was the person who wielded the whiskey bottle and beat her, the lack of defendant’s prints on the bottle could impeach Price’s credibility as to identification. Likewise, since Manual identified defendant as the person who touched the cooler door and the twelve-pack of beer from which fingerprints were lifted, the lack of defendant’s prints on these items could impeach Manual’s credibility as to identification. Since the sole evidence against defendant is the identifications given by the victims, Price and Manual, and the defense is misidentifi-cation, we find that defendant’s constitutional right to a fair trial was seriously prejudiced by the late disclosure of the fingerprint evidence.
Therefore, we find that under LSA-C. Cr.P. art. 729.5 the trial court abused its discretion in failing to grant defendant’s motion for a continuance. A continuance would have been a reasonable method of curing the constitutional problems caused by the late disclosure of the fingerprint evidence. See State v. Busby, 464 So.2d 262 (La.1985); State v. Smith, supra; State v. Arnaud, supra; State v. Cook, supra. The case must be remanded for a new trial.
CONCLUSION
For the reasons given, defendant’s conviction is reversed and his sentence is vacated. The case is remanded for a new trial in accordance with the law and the views expressed herein.
REVERSED; SENTENCE VACATED; REMANDED.