# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**22-386**

**STATE OF LOUISIANA**

**VERSUS**

**SHAVIS BREON TOBY**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR 1692232
HONORABLE ROYALE L COLBERT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**VAN H. KYZAR**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Shannon J. Gremillion, Van H. Kyzar, and Ledricka J. Thierry, Judges.

**AFFIRMED.**

Rachel I. Conner
Law Office of Rachel I. Conner
3015 Magazine Street
New Orleans, LA 70115
(504) 581-9083
COUNSEL FOR DEFENDANT/APPELLANT:
    Shavis Breon Toby

Donald D. Landry
District Attorney
Kenneth P. Hebert
Assistant District Attorney
Fifthteenth Judicial District
P. O. Box 3306
Lafayette, LA 70501
(337) 232-5170
COUNSEL FOR APPELLEE:
    State of Louisiana

**KYZAR, Judge.**

Defendant appeals his convictions and sentences for second degree murder and conspiracy to commit second degree murder. For the reasons herein, we affirm the conviction and sentence imposed for each crime.

## FACTS AND PROCEDURAL HISTORY

On the night of October 13, 2018, in Lafayette, Louisiana, an assailant shot the victim, Brandon Broussard, multiple times in the front yard of his girlfriend's home. The victim died from blood loss. On December 5, 2018, a Lafayette Parish grand jury indicted Defendant, Shavis Breon Toby, and his brother and co-defendant, Carlos Anthony Toby (Carlos), for second degree murder, a violation of La.R.S. 14:30.1, and conspiracy to commit second degree murder, a violation of La.R.S. 14:26 and La.R.S. 14:30.1. After various pretrial hearings held during the intervening years, the parties began selecting a jury on June 21, 2021, and the trial commenced on June 24th.

Defendant was found guilty as charged by unanimous jury verdict on both counts on July 3, 2021. Carlos was found guilty of conspiracy to commit second degree murder. On February 25, 2022, Defendant's motions for a post-judgment verdict of acquittal and for new trial were denied. He was sentenced that same day to life imprisonment for second degree murder and to a concurrent sentence of thirty years for conspiracy to commit second degree murder.

Defendant now appeals, assigning five errors as follows:

1. [Defendant's] prosecution and convictions for second degree murder and conspiracy to commit second degree murder violate the double jeopardy clause.

2. The evidence was insufficient to prove [Defendant] guilty of second degree murder and conspiracy to commit second degree murder of Brandon Broussard.

3.      The trial court violated [Defendant's] constitutional rights when it denied his motion for a continuance of trial based on the state's late disclosure of material evidence.

4.      [The] [t]rial court erred in allowing [the] prosecution to enter irrelevant, prejudicial testimony about an unrelated firearm recovered from [Defendant's] residence.

5.      The trial court erred when it qualified Sonny Stutes as an expert in cellular mapping and analysis.

## DISCUSSION OF ASSIGNED ERRORS

### Double Jeopardy

In his first assignment of error, Defendant argues his convictions for second degree murder and conspiracy to commit second degree murder violated his constitutional protection against double jeopardy.[1] The basis of his argument is that the two convictions were based upon the same evidence, citing *State v. Steele*, 387 So.2d 1175 (La.1980), and *State v. Rabun*, 38,655 (La.App. 2 Cir. 8/18/04), 880 So.2d 184. However, Defendant is incorrect in that Louisiana no longer uses the "same evidence test" to analyze double jeopardy claims.

The supreme court dispensed with the "same evidence" test in *State v. Frank*, 16-1160, p. 10 (La. 10/18/17), 234 So.3d 27, 33-34, wherein the court held "that the protections against double jeopardy mandated by the federal constitution, as restated in this state's constitution, fall within the analytical framework set forth in *Blockburger* and Louisiana courts need only apply that framework in analyzing questions of double jeopardy." Defendant, here, does not mention the extant test, known as the "distinct fact" test or the "*Blockburger*" test. *See Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180 (1932). The second circuit has explained:

---

[1] Normally, sufficiency reviews are addressed first, as a finding of insufficient evidence results in an acquittal. *State v. Hearold*, 603 So.2d 731 (La.1992). However, we address the double jeopardy assignment first, as the issue is jurisdictional in nature. *See, e.g., State v. Sarrabea*, 12-1013 (La.App. 3 Cir. 5/1/13), 157 So.3d 1, *aff'd*, 13-1271 (La. 10/15/13), 126 So.3d 453.

The *Blockburger* test determines whether each crime requires proof of an additional fact which the other does not. . . .

. . . .

Further, the United States Supreme Court has explicitly stated that a substantive crime and a conspiracy to commit that crime are not the same offense for double jeopardy purposes. *United States v. Felix*, 503 U.S. 378, 112 S.Ct. 1377, 118 L.Ed.2d 25 (1992); *see also Iannelli v. United States*, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975), . . . a conviction for conspiracy does not depend upon the actual commission of the crime, but only upon an act in furtherance of the conspiracy.

*State v. Randle*, 49,952, pp. 11-12 (La.App. 2 Cir. 6/24/15), 166 So.3d 465, 472-73.

The elements of the crime of second degree murder do not require proof of an agreement or plan, as conspiracy to commit the crime does. Thus, the convictions at issue do not run afoul of *Blockburger* or *Frank*. In addition, La.R.S. 14:26(B) explicitly allows for the prosecution of a defendant for both conspiracy and the completed crime.

Accordingly, we find that Defendant's convictions for second degree murder and conspiracy to commit second degree murder do not implicate a violation of the double jeopardy clause prohibition. Thus, we find this assignment of error lacks merit.

***Sufficiency of the Evidence***

In his second assignment of error, Defendant complains that the evidence presented against him at trial was insufficient to support the convictions. He states that the evidence introduced to support the convictions against him was unreliable and "entirely circumstantial[.]"

The analysis for sufficiency challenges is well-established:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct.

2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

The elements of the crime of second degree murder are set forth in La.R.S. 14:30.1(A), which states in pertinent part: "Second degree murder is the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm[.]" Further, conspiracy is defined by La.R.S. 14:26(A):

Criminal conspiracy is the agreement or combination of two or more persons for the specific purpose of committing any crime; provided that an agreement or combination to commit a crime shall not amount to a criminal conspiracy unless, in addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination.

Defendant's main argument as to the conspiracy conviction is based not on the issue of the element of "agreement" or "combination" but upon the elements of the commission of second degree murder, particularly identification as to whether he committed the killing or participated therein. Defendant is generally correct in stating that the case against him was based upon circumstantial evidence. He argues that there were no witnesses to the shooting to provide direct evidence about it; likewise, that were no witnesses to provided direct evidence regarding the alleged conspiracy. The analysis of circumstantial evidence is governed by La.R.S. 15:438, providing that "[t]he rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every

4

reasonable hypothesis of innocence." In the context of a sufficiency review, the supreme court has explained:

> This is not a separate test that applies instead of a sufficiency of the evidence test when circumstantial evidence forms the basis of the conviction. *State v. Cummings*, 95-1377, p. 4 (La.2/28/96); 668 So.2d 1132, 1134. Rather, all of the evidence, both direct and circumstantial, must be sufficient under *Jackson* [*v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781(1979),] to convince a rational juror the defendant is guilty beyond a reasonable doubt. It is not the function of the appellate court to assess credibility or reweigh the evidence. *Id.*

*State v. Dorsey*, 10-216, pp. 42-43 (La. 9/7/11), 74 So.3d 603, 633, *cert. denied*, 566 U.S. 930, 132 S.Ct. 1859 (2012).

Also, Defendant notes the settled principle that where identification is at issue, any reasonable probability of misidentification must be negated. *State v. Young*, 20-1041, p. 2 (La. 5/13/21), 320 So.3d 356, 358.

Defendant presents a very brief argument in support of his insufficiency claim in which he notes that a glove fragment (the fingertip) found near the crime scene was not found until hours after the murder and was located outside the protected perimeter of the scene. He argues that the video footage and cell phone data the State presented in support of its case was insufficient to prove his guilt. He notes there were no eyewitnesses to the shooting and argues that under the reasonable doubt standard, the State's evidence fell short of demonstrating his identity as a shooter. He also states that the University of Louisiana at Lafayette (ULL) was holding homecoming events at the time of the crime, and thus, there were "literally thousands of individuals[]" in the area.

Viewing the evidence in the light most favorable to the prosecution, as we must do on a sufficiency review, we take note of the significant evidence supporting the jury's verdicts of guilty on the second degree murder and conspiracy to commit murder second degree murder offenses. Defendant's DNA was found on the piece of a blue latex glove left in the backyard near the crime scene. Clare Guidry, with

5

the Acadiana Criminalistics Laboratory, was accepted as an expert in DNA Analysis and testified concerning the DNA sample taken from the interior of the fingertip of the glove. It was her opinion that "it could be concluded that to a reasonable degree of scientific certainty, [Defendant] is the source of the major contributor profile." The State introduced blue latex gloves recovered from a search of Defendant's residence, which were similar to the glove fragment found near the scene of the crime. Cellphone tracking data showed, within four hundred meters of accuracy, that Defendant was near the scene of the crime on the date of and near the time of the murder. The victim was shot on October 13, 2018, at approximately 10:55 p.m., in front of the residence of his girlfriend, Lashae Dugas, located at 313 Grossie Drive in Lafayette. The cellphone-tracking evidence indicated that Defendant was in that vicinity from approximately 10:54 p.m. until 11:02 p.m. Defendant makes no genuine attempt to challenge the reliability of the DNA or cellphone-tracking evidence.

Video footage taken from surveillance cameras at various residences around the Grossie Drive address showed a black Jeep vehicle, of the same model as that model owned by Defendant, in the area on the date of the offense, though it was not positively identified as his Jeep. However, Staff Sergeant Shannon Deshotel, of the Lafayette Parish Sheriff's Office, participated in the investigation and identified various surveillance videos from the Grossie Drive neighborhood up to and after the time of the murder on October 18, 2018. He identified a black Jeep seen cruising the street multiple times prior to the murder. He described the specific characteristics of the vehicle in his testimony including its "color, the size, round headlights, round taillights, a tire mounted onto the rear of the hatch, and a luggage rack." He further stated it had "[d]ark rims, dark color, the wheel flares were a lighter color." He added, "Also the placement of the license plate. Normally, when

6

you look at a vehicle, the license plate is in the center, on the bumper. This one was to the far left, on the driver's side, almost directly underneath the driver's side taillight." He testified that the vehicle was first seen cruising the neighborhood around 9:00 p.m. the evening of the murder and was spotted on video surveillance footage taken from houses located at 401 Grossie Drive, 121 Terry, 101 Terry, and 215 Prairie Lane, the street where the murder occurred and surrounding streets. Sgt. Deshotel detailed the videos showing the movements of the black Jeep in the hour or more leading up to the time of the homicide, then he detailed what the videos show immediately prior to the reports of the shooting, stating that at 10:39 p.m., about the same time Ms. Dugas returned home from a party, "[r]ight here in this area, about where this light is down here, you're going to see some headlights pull into the homicide scene, and it's going to illuminate the back yard" and that "[a]s it illuminates the back yard, you see a" . . . "silhouette of a person walking towards the area[.]"

Sgt. Deshotel pointed out the significance of the silhouette: "Where I see the silhouette on video is where we located the blue latex fingertip glove." He further pointed to portions of the video showing the silhouette just prior to the murder. "See where the headlights are? That's the silhouette. The subject is walking towards the mobile home trailer." Then, at 10:53 p.m., he observed Brandon Boudreaux coming home from a party and then observed the muzzle flash from a firearm. Describing the video footage, Sgt. Deshotel testified:

> I heard -- I heard the gunshots from the audio video prior. I observed a male or a subject in black or dark clothing, running southbound towards Woodview. After I observed the subject in dark clothing, I observed a small dark-colored SUV traveling behind him. They both meet up on Woodview Drive.

He stated that the vehicle had the same characteristic as the vehicle observed casing the area in the time leading up to the murder.

7

Sgt. Deshotel testified that during the course of the investigation he and other officers located a vehicle matching the description of the vehicle seen in the surveillance videos, a 2002 Jeep Liberty, License 479CHX, which was registered to Defendant and found at his mother's residence. He further recounted information learned from the cellular phone records as to the whereabouts of Defendant and Carlos on the day and night of the murder:

> Pattern of travel of basically -- the cellular phone records showed that Carlos Toby left the Texas area. He made, I guess you'd say a pit stop, off of I-10 somewhere, in the Rayne area. Then at -- I believe that was at 6:16 p.m. on October 13th. After that, at approximately 6:30 p.m., his cellular phone device emits a signal off of a cell tower in Lafayette. At the same time, [Defendant's] cellular phone device starts leaving New Iberia, heading to Lafayette. So at approximately, I want to say 7:30 p.m., they basically meet in the same area of Lafayette and cease all communications.

Sgt. Deshotel stated that the cell phone records indicated that both cell phones were communicating or connecting to each other as they approached Lafayette. "All communications ceased once the two cellular devices meet." He further detailed steps taken after analyzing the cell phone location information as to the black Jeep's location after the murder: "After learning the pattern of travel, we went to RaceTrac on the Evangeline Thruway. Detective Neil St. Cyr and Detective Joey Graciano reviewed the footage. They observed the dark-colored SUV, traveling northbound on Evangeline Thruway after the homicide, and traveling southbound on Evangeline Thruway."

Captain Sonny Stutes, of the Lafayette Parish Sheriff's Office, also testified regarding the cell phone tracking data.[2] He detailed the movement of Defendant's phone from the Youngsville area where he lived, to Lafayette on the evening of the murder, in the area of Grossie Drive up through the time of the murder, and then

---

[2] Defendant objected to the qualifications of Capt. Stutes as an expert in cell phone data tracking. Discussion of that issue is covered below.

leaving Lafayette and going back to the Youngsville area after the murder. There was a four plus minute call with Carlos while on the route back to Youngsville. Capt. Stutes further testified as to the information from Carlos's cell phone records, which showed his cell phone tracking from the Beaumont, Texas area, where he was living at the time, around 4:00 p.m. on the date of the murder, and then into Louisiana. The records showed that he stopped in Rayne, Louisiana, where they were able to get video evidence off a convenience store surveillance camera of Carlos in a black Cadillac around 5:00 to 6:00 p.m.[3] They further showed that he arrived in Lafayette around 6:22 p.m. and that around 7:24 and for a time after, the phone was tracking in the area of the murder. The records also showed multiple calls between the two phones while both were enroute to Lafayette, and the last call between Defendant and Carlos prior to the murder took place at 7:18 p.m. Capt. Stutes concluded that the two met up together at 7:18 p.m. and were together until after the murder.

In addition, the State introduced testimony and evidence from a search of Defendant's residence. During the search, investigators found several .40 caliber bullets, the same caliber used in the murder of the victim. As mentioned above, the search also produced blue latex gloves, similar to the fingertip of the blue latex glove found at the crime scene. In addition, dark clothing, including a black shirt, black pants, and black military style boots were found at the house, but more specifically outside the house in a trash bin on or next to the front porch. A black hoodie jacket was also found in the search of the home. Notably, testimony at trial showed the shooter wearing black or dark clothing.

Further, the State introduced evidence that Carlos lost a fistfight to the victim approximately a week before the murder, and it suggested, in argument, that the

---

[3] Evidence reflected that when Carlos was arrested in Texas, agents seized the black Cadillac vehicle.

beating was a motive for the killing. While motive is not an element of the crime, it is relevant circumstantial evidence as to the identification of Defendant and his brother as potential perpetrators and conspirators. Finally, while Defendant argues that there were perhaps thousands of people in and around the ULL campus because of its homecoming events, he makes no attempt to develop this argument further, leaving this court to only speculate as to its relevance or any weight to be given thereto. Without more, Defendant's point that there may have been many people in the general vicinity of the murder does not present a reasonable hypothesis of innocence.

The "due process, rational fact finder test of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), does not permit a reviewing court to substitute its own appreciation of the evidence for that of the fact finder or to second guess the credibility determinations of the fact finder necessary to render an honest verdict[,]" and "[a] reviewing court may intrude on the plenary discretion of the fact finder 'only to the extent necessary to guarantee the fundamental protection of due process of law.'" *State v. Calloway*, 07-2306, p. 10 (La. 1/21/09), 1 So.3d 417, 422 (quoting *State v. Mussall*, 523 So.2d 1305, 1310 (La.1988)).

Here, the jury decided the weight to be given to all of the evidence and the rational inferences to be drawn therefrom. Pursuant to *Kennerson*, we find that these key pieces of evidence demonstrate that the jury's decision to convict Defendant was not irrational. The jury saw multiple surveillance videos of the vehicle matching the one owned by Defendant casing the crime scene in the hours leading up to the murder. The jury also viewed the phone data and tracking illustrations showing the locations of Defendant's and Carlos's phones in the hours leading up to the murder, showing that the two had joined up. Back and forth calls between the two ceased until after the murder when Defendant was leaving the Lafayette area. The evidence showed

10

a black male in dark clothing at the scene of the murder, when a muzzle flash was seen coming from the .40 caliber gun he used to shoot and kill the victim. He then ran and met up with the black Jeep, driven by his co-defendant. Defendant's DNA is found in the glove fragment at the scene, which matched gloves found at Defendant's residence. Also found at Defendant's residence were .40 caliber ammunition and dark clothing. Viewing the evidence in a light most favorable to the prosecution, we find it sufficient to support the guilty verdicts as to each offense.

***Denial of Motion to Continue***

In his third assignment of error, Defendant argues that the trial court erred in denying his June 11, 2021 motion for a continuance. He states that he received nine hundred pages of discovery at close of business on June 8, and as trial was set for June 21, the late disclosure of this discovery material rendered him "legally ineffective." At a hearing on June 16, 2021, the trial court denied the motion, along with companion motions to withdraw and for sanctions.[4]

Louisiana Code of Criminal Procedure Article 712 provides that "[a] motion for continuance, if timely filed, may be granted, in the discretion of the court, in any case if there is good ground therefor." Also, La.Code Crim.P. art. 707 states:

> A motion for a continuance shall be in writing and shall allege specifically the grounds upon which it is based and, when made by a defendant, must be verified by his affidavit or that of his counsel. It shall be filed at least seven days prior to the commencement of trial.
>
> Upon written motion at any time and after contradictory hearing, the court may grant a continuance, but only upon a showing that such motion is in the interest of justice.

---

[4]The beginning of Defendant's assignment implies that the late disclosure of the sheer volume of discovery received may have caused his counsel difficulties in trial preparation. However, this is not the argument he ultimately makes in brief and will not be considered by this court on appeal. Uniform Rules—Courts of Appeal, Rule 2-12.4; *State v. Matthews*, 22-422 (La.App. 3 Cir. 11/16/22), ___ So.3d ___.

11

The appellate standard of review of a trial court decision to grant or deny a continuance is whether the decision was an "abuse of discretion." *See, e.g., State v. Reeves*, 06-2419, p. 73 (La. 5/5/09), 11 So.3d 1031, 1078, *cert. denied*, 558 U.S. 1031, 130 S.Ct. 637 (2009).

After denying the motion for continuance, the trial court and the parties further discussed matters related to discovery and the continuance. Counsel for Carlos re-urged sanctions. The State argued, and co-counsel partially acknowledged, that defense counsel had knowledge of the materials at issue even before they had it in hand. In addition, the trial court ruled that certain evidence related to a search warrant executed in New Iberia could not be used at trial. The State also indicated that other portions of the discovery included materials that it would not attempt to use at trial and that some other items could be addressed individually at a later time if it sought to introduce them at trial.

Defendant cites *State v. Hunter*, 571 So.2d 834 (La.App. 3 Cir. 1990), in which this court reversed a conviction due to the State's late disclosure of fingerprint evidence that was key to a pivotal issue in his trial, his identification as the perpetrator. Here, contrary to *Hunter*, Defendant fails to specify which items of evidence within the late discovery release were vital to his case and, thus, had an adverse effect on defense counsel's preparation of his case. In fact, as noted above, the record reflects that the trial court did exclude some evidence, and the State voluntarily elected not to use other evidence included in the discovery. In view of the lack of any further specificity, Defendant has failed to demonstrate that the trial court abused its discretion, and we find no error in its decision to deny a continuance.

*Admissibility of Evidence*

In his fourth assignment of error, Defendant argues that the trial court erred in allowing the State to introduce irrelevant and prejudicial evidence seized from his

12

residence over his objections. Specifically, he states that the State introduced evidence of a .380 caliber pistol, .380 ammunition, and .40 caliber rounds that he argues had nothing to do with the case.

Louisiana Code of Evidence Article 403 provides that even if evidence is determined to be relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." In addition, La.Code Evid. art. 402 states, in pertinent part, "Evidence which is not relevant is not admissible." The supreme court has stated that a trial court has broad discretion in weighing the probative and prejudicial value of evidence pursuant to La.Code Evid. art. 403. *See State v. Bordenave*, 95-2328 (La. 4/26/96), 678 So.2d 19 (per curiam).

In anticipation of the State's introduction of the .380 caliber pistol and the .380 and .40 caliber ammunition, Defendant lodged an objection, stating, "Your Honor, under Article 841 of the Code of Criminal Procedure, I am required by law to make a contemporaneous objection. If I don't make an objection now, whatever I do is waived." He stated that the basis of the objection was relevancy, and that even if relevant, the admission of this evidence was prejudicial. Defendant argued that the .40 caliber ammunition found during the search of his residence was not relevant and was prejudicial. He noted that no testing had been done to determine, ballistically, if the ammunition was related to the murder weapon. However, the State responded that the murder weapon was, in fact, a .40 caliber firearm. After hearing the State's argument, the trial court stated, "I'm going to rule that the .40 caliber comes in."

We find this evidence to be highly relevant to the case at hand. Further, Defendant makes no argument that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice, confusion of the issues,

13

or misleading the jury, or by any considerations of undue delay or waste of time. Finally, we note that at the close of the argument, when the trial court ruled the .40 caliber ammunition was admissible, defense counsel appeared to have acquiesced and failed to object to the ruling, as he replied, "That's fine." Accordingly, there was no error by the trial court in allowing the introduction of the same.

Defendant further asserts that the trial court erred in admitting the .380 pistol and .380 ammunition into evidence. He, likewise, argues that it was not relevant and was prejudicial. We note, however, that after lengthy argument, the trial court actually reserved ruling on the admissibility of the gun and ammunition until later, when the items were actually introduced, stating, "I am not going to, at this point, make a ruling on the exclusion of the firearm, the .380, and the .380 ammunition, only because I will see - - I have to see how the case develops." While the trial court elected not to rule on the admissibility of the .380 caliber materials, they do not appear to have been mentioned again until Defendant's case, when his own counsel asked about the .380 firearm, a Ruger, on direct examination. Further, Defendant has not set forth any specific argument that the items were not relevant or that their introduction was prejudicial. Thus, we fail to find any abuse of discretion of the trial court in the handling of the issue surrounding these items.

Lastly, as pertaining to the evidentiary issues, Defendant notes, in brief, that the trial court erred in allowing the introduction of the blue latex gloves. However, he makes no further argument in explanation of his allegation. We note as well that Defendant withdrew any objection thereto at trial, stating, "Now, there are additional items that were seized; clothing items for example, a box of latex gloves, for example. I cannot honestly object to those under the grounds of relevancy. That would be in fact disingenuous." Having withdrawn his objection at trial, Defendant cannot now complain that the evidence was admitted in error.

14

## *Qualifications of Expert Witness*

In his fifth and final assignment of error, Defendant argues the trial court erred when it accepted Capt. Stutes as an expert in cellular mapping and analysis. During his qualification testimony on direct examination, Capt. Stutes explained the background, use, and workings of cell phone location-data tracking, the use of CellHawk, a cellphone-records-mapping computer-software program used to map historical use of a particular phone in particular locations, and the difference between cell phone pinging and dumping.[5] He also detailed his involvement in cell phone-data information, records, systems and data recovery and its use by him in law enforcement investigations since the late 1990s. He testified as to his training, both on the job and through courses. Defendant's counsel and Carlos's counsel both conducted traversal of Capt. Stutes's qualifications. During traversal, Capt. Stutes testified, "Cell Hawk is a very simple program. It's designed to be very simple." Following the traversal of the witness's qualifications and the arguments of counsel, the trial court admitted the witness as an expert in the field of "cellular record mapping and analysis."

The controlling provision on this issue is La.Code Evid. art. 702(A), which states, in pertinent part:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (2) The testimony is based on sufficient facts or data;

---

[5] Capt. Stutes explained that cell phone "pinging" allows someone to locate a particular cell phone in real time, while cell phone "dumping" allows one to recover data that has been erased from a cell phone's memory. Neither of these methods were used in this case.

15

(3) The testimony is the product of reliable principles and methods; and

(4) The expert has reliably applied the principles and methods to the facts of the case.

As Defendant acknowledges, a trial court's decisions on expert testimony and scientific evidence are reviewed for abuse of discretion. *State v. Lee*, 14-2374 (La. 9/18/15), 181 So.3d 631.

When Defendant's counsel lodged his objection to Capt. Stutes's qualification as an expert, he made three main arguments, none of which relate to the methodology, testability, or reliability of the evidence to be presented as per the test set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993). Thus, we consider only Defendant's arguments relative to Capt. Stutes's qualifications to testify as an expert in the field, and not to the admissibility of his testimony as related to its methodology, testability, or reliability. *State v. Washburn*, 16-335 (La.App. 3 Cir. 11/2/16), 206 So.3d 1143, *writ denied*, 16-2153 (La. 9/15/17), 225 So.3d 488; and *State v. Torregano*, 03-1335 (La.App. 5 Cir. 5/11/04), 875 So.2d 842.

First, Defendant argued that the State was "fuzzy" on what field it was seeking to qualify Capt. Stutes in: "cellular mapping and analysis" or "cellular mapping and records analysis." We find this argument to present a distinction without a difference, given that counsel did not elaborate on how the terms might differ or prejudice Defendant. Counsel's second point was that Capt. Stutes had never been qualified in this field before. Logically, this fact does not weigh heavily against having Capt. Stutes testify as an expert, as some case always will be the first one in which a given witness qualifies as an expert. Counsel argued to the trial court that qualifying Capt. Stutes for the first time in this case would make Defendant and Carlos "guinea pigs." However, this concern was minimized by counsel's final argument, that Capt.

16

Stutes's own testimony indicated that CellHawk was easy to understand and use and, as a result, expert testimony was unnecessary.

Citing La.Code Evid. art. 702, the trial court stated, "Under Article 702, I actually don't find y'all['s] traversal was effective at all. Y'all didn't question his knowledge, his skill or experience, therefore I'm going to qualify him as an expert. He is accepted." We agree, finding that Defendant has failed to demonstrate that the trial court abused its discretion. Further, we find that even if the trial court had erred in qualifying Capt. Stutes as an expert, any such error was harmless. In doing so, we note that Sgt. Deshotel had already testified extensively, without objection, as to the cell phone tracking data. *See State v. Thomas*, 16-578, p. 42 (La.App. 3 Cir. 4/19/17), 217 So.3d 651, 678, *writ denied*, 17-1153 (La. 8/31/18), 251 So.3d 411. Thus, there was no prejudice to Defendant, as the evidence was cumulative.

## ERRORS PATENT

All appeals are reviewed for errors patent on the face of the record. La.Code Crim.P. art. 920. After reviewing the record, we find three errors patent, none of which require reversal of Defendant's convictions.

First, La.Code Crim.P. art. 383 requires that an indictment be "indorsed a true bill" and "signed by the [grand jury] foreperson." Although the indictment was indorsed a true bill, it does not bear the grand jury foreperson's signature. However, the trial court minutes indicate that on December 5, 2018, the grand jury report was returned in open court indicating that they presented five true bills and three no true bills. The minutes indicate that the report was signed by the grand jury foreperson, and the minute entry immediately after it shows a true bill was returned in Defendant's case. Additionally, there is no indication that Defendant objected or filed a motion to quash the indictment based on any deficiency therein.

17

In *State v. Halley*, 16-713, p. 3 (La.App. 4 Cir. 2/8/17), 212 So.3d 596, 599,

*writ denied*, 17-421 (La. 10/27/17), 228 So.3d 1228, the fourth circuit held:

> The record in this appeal contains the front, but not the back, of the bill of indictment where the proper endorsement and signature would appear. However, the trial court minutes, and the list of the Grand Jury Return of Indictments contained in the record indicate the indictment was indeed returned as a "true bill" in open court and properly signed by the foreperson of the grand jury. Thus, we find this patent error to be harmless.

Subsequently, in *State v. Hawkins*, 16-458, p. 13 (La.App. 4 Cir. 5/17/17), 219 So.3d

1133, 1141, *writs denied*, 17-1183, 17-1280 (La. 5/18/18), 242 So.3d 575, the fourth

circuit held:

> This Court recently indicated that the failure of the record to contain the reverse side of an indictment, where the record reflects (by way of the court minutes) that a true bill was returned and the grand jury return of indictments reflects that the indictment was signed by the grand jury foreperson is harmless error. *State v. Chambers*, 16-0712, p. 4 (La.App. 4 Cir. 2/15/17), 212 So.3d 643, 647-48. We have also held that the failure of a defendant to object to alleged deficiencies in an indictment and the failure of a defendant to file a motion to quash the indictment on that basis waives those errors. *State v. Porche*, 00-1391, p. 5 (La.App. 4 Cir. 2/14/01), 780 So.2d 1152, 1155; *See also*, *State v. Miller*, 98-642 (La.App. 3 Cir. 10/28/98), 720 So.2d 829, 831. Accordingly, we find no reversible error in this error patent.

Applying the rationale of *Halley* and *Hawkins*, we conclude that this error was

waived by Defendant's failure to object or file a motion to quash the indictment and

is, otherwise, harmless error, requiring no action by this court.

Next, Defendant's sentencing was taken up immediately following the denial

of his motions for new trial and post-verdict judgment of acquittal. Louisiana Code

of Criminal Procedure Article 873 provides that "[i]f a motion for a new trial, or in

arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four

hours after the motion is overruled[,]" but that "[i]f the defendant expressly waives

a delay provided for in this article or pleads guilty, sentence may be imposed

immediately." However, La.Code Crim.P. art. 873 does not specifically mention a

motion for post-verdict judgment of acquittal, and it is not clear whether the delay is required after the denial of such a motion.[6] Nonetheless, it is not necessary to resolve this issue as Defendant filed a motion for new trial, and the delay clearly applies thereto.

While a waiver of the delay may be made expressly, "[a]n implicit waiver, however, runs afoul of the plain language of Art. 873[.] *State v. Kisack*, 16-797, p. 7 (La. 10/18/17), 236 So.3d 1201, 1205, *cert. denied*, __ U.S. __, 138 S.Ct. 1175 (2018). Here, there was no explicit waiver of the delay following the denial of the motion for new trial. "Nonetheless, an error in failing to observe the statutory sentencing delay may still be found harmless." *Id.*

Prior to the supreme court's ruling in *Kisack*, "errors in failing to observe La.Code Crim.P. art. 873's mandatory sentencing delay were found harmless where a mandatory life sentence was imposed or when the defendant did not challenge his sentence on appeal and did not claim prejudice due to the lack of the delay." *State v. Holden*, 19-867, p. 8 (La.App. 3 Cir. 7/15/20), 304 So.3d 520, 525, *writ denied*, 20-1016 (La. 2/9/21), 310 So.3d 174. Since *Kisack*, courts have continued to find harmless error where a mandatory life sentence is imposed or when the defendant does not challenge his sentence on appeal and does not claim prejudice due to the lack of the delay. *See State v. Deville*, 22-317 (La.App. 3 Cir. 10/19/22), 349 So.3d 1158; *State v. Williams*, 20-605 (La.App. 3 Cir. 11/3/21), 329 So.3d 938, *writ denied*, 21-1798 (La. 4/12/22), 336 So.3d 85; and *State v. Chester*, 19-363 (La.App. 5 Cir. 2/3/21), 314 So.3d 914, *writ denied*, 21-350 (La. 6/8/21), 317 So.3d 321. In the

---

[6] Some cases have found the delay applies to a motion for post-verdict judgment of acquittal. *See State v. Boyance*, 05-1068 (La.App. 3 Cir. 3/1/06), 924 So.2d 437, *writ denied*, 06-1285 (La. 11/22/06), 942 So.2d 553; *State v. Johnson*, 11-375 (La.App. 5 Cir. 12/28/11), 83 So.3d 1116, *writ denied*, 12-296 (La. 6/22/12), 91 So.3d 966. However, some cases have found that the delay does not apply. *See State v. Harris*, 42,376 (La.App. 2 Cir. 9/26/07), 966 So.2d 773, *writ denied*, 07-2109 (La. 3/28/08), 978 So.2d 304; and *State v. Scott*, 98-2642 (La.App. 4 Cir. 2/16/00), 754 So.2d 1108, *writ denied*, 00-723 (La. 9/29/00), 769 So.2d 1219.

present case, Defendant neither challenges the sentences imposed nor claims he was prejudiced by the lack of a delay. Thus, we conclude the error to be harmless under these circumstances.

Finally, the record before this court does not indicate that the trial court advised Defendant of the prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. The trial court is directed to inform Defendant of the provisions of La.Code Crim. P. art. 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of this opinion and to file written proof in the record that Defendant received the notice. *State v. Hutchinson*, 18-445 (La.App. 3 Cir. 12/12/18), 261 So.3d 927, *writ denied*, 19-108 (La. 5/28/19), 273 So.3d 313, *cert. denied*, __ U.S. __, 140 S.Ct. 648 (2019).

### DECREE

The convictions and sentences are affirmed. The trial court is directed to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to the Defendant within ten days of the rendition of this opinion and to file written proof in the record that Defendant received the notice.

**AFFIRMED.**